**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT GORMAN, TIMOTHY HENNESSY, and JAMES SPIRA, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNILEVER UNITED STATES, INC., ALBERTO-CULVER COMPANY SALARIED EMPLOYEES SPECIAL SEVERANCE PLAN, CHRISTOPHER HERRICK, individually and as Plan Administrator, )<br><br>Defendants. ) | Case No. _____<br><br>Honorable Judge _____ |

## COMPLAINT

Plaintiffs, Robert Gorman ("Mr. Gorman"), Timothy Hennessy ("Mr. Hennessy"), and James Spira ("Mr. Spira"), by and through their undersigned attorneys, Michael I. Leonard and Ethan E. White of Leonard Law Offices, state as follows as their Complaint against Defendants Unilever United States, Inc. ("Unilever"), Alberto-Culver Company Salaried Employees Special Severance Plan (the "2007 Severance Plan" or "the Plan"), and Christopher Herrick, individually and as Administrator of the 2007 Severance Plan:

## **INTRODUCTION**

Mr. Gorman, Mr. Hennessy, and Mr. Spira, were employees of the Alberto-Culver Company ("Alberto-Culver"), all with long and successful careers, working in the suburbs of Chicago in Melrose Park, Illinois. All three Plaintiffs were protected in the event that, were Alberto-Culver ever to face a "Change of Control" situation (such as a take-over by another corporation), their livelihoods would be protected by the benefits offered by the Alberto-Culver Severance Plan. When that takeover occurred in May 2011, by way of Unilever's purchase of Alberto-Culver, all three Plaintiffs were told their positions were eliminated without cause. In addition, since Alberto-Culver's headquarters were to be closed (which has now occurred), if a position did exist for them, it would be located in New Jersey at Unilever's headquarters – more than 800 miles from the Plaintiffs' current place of work.

When these Plaintiffs sought to secure the severance payments they were rightfully entitled to under the Plan, they were faced with the inept, arbitrary, and capricious decisions of the Plan Administrator, who refused to pay severance benefits under wholly manufactured and absurd "reasoning" including that the Plaintiffs would be required to move more than 800 miles to "start" a new job in order to become eligible for severance pay from their old position. Compounding the problem, when these Plaintiffs pointed out a separate reason for severance plan eligibility – namely, the elimination of Alberto-Culver equity grant programs – the Plan Administrator offered changing, conflicting, and ultimately false explanations for their ineligibility. Specifically, after first informing these Plaintiffs that they would have been eligible for a similar Unilever equity grant program, the Plan Administrator then admitted that no such plan existed, but was replaced with a cash equivalent program. As these Plaintiffs

learned, *no similarly situated employee* (participants in the Plan under the level of Vice President) *ever received cash under that alleged program*.

Further, when Plaintiffs sought to have their termination dates accelerated – as had been done by Unilever for several other employees in the Plan (including several vice-presidents and at least one member of the Human Resources department), specifically to allow those employees to receive severance benefits under the Plan at issue – those requests were summarily denied with the false explanation that no accelerated terminations or other accommodations had been made. Subsequently, when Plaintiffs attempted to investigate and appeal their claims, the Administrator refused to provide them with the relevant documents the Administrator would have been required to review to deny their severance claims; in some cases responded in an untimely manner (when he responded at all); offered a changing story regarding who was eligible for benefits, the benefits available, and even the reasons for denying Plaintiffs the benefits to which they were entitled – all the while admitting the inconsistencies in carrying out the terms of the Plan. Of course, the Plan Administrator never intended to fairly review claims for severance. Unilever and the Plan Administrator had each expressly eliminated "Good Reason," the primary basis for all severance claims, by impermissibly adding a condition that all Plan participants had to work until an arbitrary date, selected by Unilever, in order to receive severance, thereby amending the Plan in a manner adverse to the participants and in contravention of the Plan. In doing so, Unilever and the Plan Administrator used the Plan coercively as a retention tool, rather than for its intended and true purpose of protecting participants from the very actions perpetrated by defendants here.

Plaintiffs have now exhausted all administrative remedies available to them and turn to this Court to address the Plan's baseless, arbitrary, and capricious denials of their claims.

3

## I.  **THE PARTIES**

1.      Plaintiff, Robert Gorman ("Mr. Gorman"), is a citizen and resident of the State of Illinois, residing in Chicago, Illinois.  Mr. Gorman was formerly employed by Defendant Unilever, as well as by Alberto-Culver prior to the merger.

2.      Plaintiff, Timothy Hennessy ("Mr. Hennessy"), is a citizen and resident of the State of Illinois, residing in Wheaton, Illinois.  Mr. Hennessy was formerly employed by Defendant Unilever, as well as by Alberto-Culver prior to the merger.

3.      Plaintiff, James Spira, is a citizen and resident of the State of California, residing in San Diego, California.  Mr. Spira was formerly employed by Defendant Unilever, as well as by Alberto-Culver prior to the merger.

4.      At all relevant times, Mr. Gorman, Mr. Hennessy, and Mr. Spira were "participants" and "beneficiaries" within the meaning of the Employee Retiree Income Security Act ("ERISA").  *See* 29 U.S.C. § 1002(7).

5.      Defendant, Unilever, is a Delaware corporation with its principal place of business located at 800 Sylvan Avenue, Englewood Cliffs, New Jersey.  Unilever is in the home, personal care, food products, and refreshments businesses.

6.      Unilever's brands are numerous and include: *Skippy* peanut butter, *Lipton* tea, *Hellman's* mayonnaise, *Ben & Jerry's* and *Good Humor* ice cream, *Slim-Fast* diet shakes, *Country Crock* margarine, *Dove* soap, *Suave* shampoo, and *Q-tips*.

7.      On its corporate website, Unilever purports to "work hard" at conducting its business with "integrity," and at "respecting" its employees.  Unilever further claims on its website that it at all times acts "with the highest standards of corporate behavior towards [its] employees."

4

8.     Unilever not only failed to live up to those lofty promises, it blatantly ignored and violated the law.  Indeed, as further set forth below, despite making *tens of billions of dollars* in profits in calendar year 2012 alone, Unilever violated the law by illegally withholding severance and other benefits due and owing to long-standing and hardworking employees, including Mr. Gorman, Mr. Hennessy, and Mr. Spira.

9.     At all relevant times, Unilever has been an "employer," within the meaning of ERISA (*see* 29 U.S.C. § 1002(5)); a "Plan Administrator" as defined by ERISA (*see* 29 U.S.C. § 1002(16)(A)); a "plan sponsor" of the 2007 Severance Plan (*see* 29 U.S.C. § 1002(16)(B)), and a "fiduciary" within the meaning of ERISA (*see* 29 U.S.C. § 1002(21)(A)).

10.     Defendant, Alberto-Culver Company Salaried Employees Special Severance Plan (the "2007 Severance Plan" or the "Plan"), is a "severance pay arrangement" within the meaning of Section 3(2)(B)(i) of ERISA, and is and was intended to meet the descriptive requirements of a Plan constituting a "severance payment plan" within the meaning of the Regulations published by the United States Secretary of Labor at Title 29 U.S.C. § 2510.3-2(b).

11.     At all relevant times, the 2007 Severance Plan, as amended, has been an "employee benefit plan" as defined by ERISA (*see* 29 U.S.C. § 1002(3)), and an "employee welfare benefit plan" as defined by ERISA.  *See* 29 U.S.C. § 1002(1).  The Plan is a separate legal entity.

12.     Defendant, Christopher Herrick ("Herrick"), is, upon and information and belief, a citizen and resident of the State of New Jersey.  At all relevant times, Herrick was employed by Unilever.  At all relevant times, Herrick was acting as if he was the "Plan Administrator" as defined by ERISA (*see* 29 U.S.C. § 1002(16)(A)), and a "fiduciary" within the meaning of ERISA (*see* 29 U.S.C. § 1002(21)(A)), though his formal appointment was not made until April,

5

2012. *See* April 2012 Board of Directors Appointment of Christopher Herrick as Administrator for Severance Plan, a true and correct copy of which is attached hereto as Ex. 28 (stating further that "all actions previously taken by Christopher Herrick with respect to the Severance Plan are hereby ratified and approved.").

## II.    JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction (29 U.S.C. § 1331) over this action because it arises under ERISA, 29 U.S.C. §§ 1001, *et. seq.* In addition, this Court can also exercise diversity jurisdiction over this action (28 U.S.C. § 1332) because the parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2), because all or a substantial part of the events or omissions giving rise to the claims set forth below occurred within this District, and with respect to employees who were, during the time period relevant to this action, employed within this District. Furthermore, the breaches of the Plan took place in this District. In addition, at all relevant times, Unilever regularly and continuously conducted business within this District and may be found within this District.

## III.    FACTS

15.    Prior to May 10, 2011, Mr. Gorman, Mr. Hennessy, and Mr. Spira were employed by the Alberto-Culver Company ("Alberto-Culver"), located just outside Chicago, in Melrose Park, Illinois. At all relevant times prior to May 10, 2011, Mr. Gorman, Mr. Hennessy, and Mr. Spira were salaried employees of Alberto-Culver.

16.    On and prior to May 10, 2011, and at all times relevant to this action, there was in place the 2007 Severance Plan, as amended effective immediately prior to the merger of Alberto-

Culver and Unilever.  *See* 2007 Salaried Employees Severance Plan, a true and correct copy of which is attached hereto as Ex. 1, Tab J; *see also* Amendment Number One to 2007 Salaried Employees Severance Plan, *id*. at 12.

17.    Mr. Gorman, Mr. Hennessy, and Mr. Spira were parties to the 2007 Severance Plan, and entitled to benefits under its provisions.

18.    The 2007 Severance Plan constituted a "severance pay arrangement" within the meaning of ERISA, and constituted a "severance pay plan" within the meaning of the Regulations published by the United States Secretary of Labor at 29 C.F.R. § 2510.3(b).  *See also* Ex. 1 at p.1 (second paragraph).

19.    On or about September 27, 2010, Alberto-Culver and Unilever executed an Agreement and Plan of Merger ("Merger Plan").  *Available at available at* http://www.sec.gov/Archives/edgar/data/1368457/000119312510258948/ddefm14a.htm.

20.    On or about December 17, 2010, Alberto-Culver's shareholders approved the merger between Alberto-Culver and Unilever.  Accordingly, a "Change in Control" occurred on that date for purposes of, and as defined by, the 2007 Severance Plan.  *See* 2007 Severance Plan, as amended, Ex. 1, Tab J, at pp. 1-3 (Section 1(c)) (defining "Change of Control").

21.    Pursuant to the parties' merger, Unilever acquired all of the outstanding shares of Alberto-Culver.

22.    On or about May 10, 2011, the merger actually closed and Alberto-Culver became a wholly-owned subsidiary of Unilever.

23.    Pursuant to Section 5.09 of the Merger Plan, Unilever assumed in writing the 2007 Severance Plan, as amended effective immediately prior to the merger of Alberto-Culver and Unilever.  *See* 2007 Severance Plan, attached hereto as Ex. 1, Tab J; *see also* Amendment Number One to the 2007 Severance Plan, *id*. at 12.

24.     Under the terms of the 2007 Severance Plan, "[a]ll questions arising in connection with the interpretation of [the] Plan or its administration [were required to be] submitted to and determined by the Plan Administrator in an equitable and fair manner." *See* 2007 Severance Plan, Ex. 1, Tab J at p. 7, 3(b).

25.     Under the terms of the 2007 Severance Plan, an employee is expressly entitled to receive severance pay following a "Change in Control" if he was terminated by the Company for any reason *other than* for "Cause," or if the employee himself leaves the Company for "Good Reason."

26.     The 2007 Severance Plan, as amended, defines "Good Reason" to be the occurrence of any of the following events after a "Change in Control:"

(1) a substantial reduction by the Company in the Employee's rate of annual base salary as in effect immediately prior to such Change in Control or as the same may be increased from time to time thereafter;

(2) any change by the Company of the Employee's place of employment to a location more than 50 miles from the location of the Employee's place of employment at the time of the Change in Control;

(3) the failure of the Company to (i) continue in effect any employee benefit plan or compensation plan in which the Employee is participating immediately prior to such Change in Control, unless the Employee is permitted to participate in other plans providing the Employee with substantially comparable benefits, or the taking of any action by the Company which would adversely affect the Employee's participation in or materially reduce the Employee's benefits under any such plan,…

***

(4) the failure of the Company to obtain express written assumption of this Plan from any successor to the Company.

2007 Several Plan, Ex. 1, Tab J at p. 4, (1)(j)(1) – (4).  *See also* Amendment Number One, Ex. 2 (*not* modifying that definition).

27.     The 2007 Severance Plan, as amended, provided that salaried employees, including Plaintiffs Mr. Gorman, Mr. Hennessy, and Mr. Spira would be entitled to receive, and would receive, "severance pay" in the following amounts:

(i)     with respect to each Severed Employee with a title of, or more senior than, Vice President, determined immediately prior to the Change in Control, the greater of (A) the base salary and annual bonus to which such Severed Employee is entitled for the period set forth in Schedule A hereto or (B) twelve (12) months of the Severed Employee's base salary;

(ii)    with respect to each Severed Employee with a title of, or more senior than, Director, but less senior than Vice President, determined immediately prior to the Change in Control, the greater of (A) the base salary and annual bonus to which such Severed Employee is entitled for the period set forth in Schedule A hereto or (B) six (6) months of the Severed Employee's base salary; [1]

(iii)   with respect to each Severed Employee with a title less senior than Director, determined immediately prior to the Change in Control, the greater of (A) the base salary and annual bonus to which such Severed Employee is entitled for the period set forth in Schedule A hereto or (B) five (5) months of the Severed Employee's base salary;

For purposes of this Plan: (1) a Severed Employee's "base salary" shall be his or her annual rate of base salary in effect either on such Severed Employees Severance Date or immediately prior to the Change of Control, whichever is greater, and (2) a Severed Employee's "annual bonus" shall be his or her target annual bonus established by the Company for the fiscal year in which the Change in Control occurs or the fiscal year in which the Severed Employee's Severance Date occurs, whichever is greater.

***

Each employee other than a Key Employee who becomes a Severed Employee shall be entitled to receive Severance Pay determined in accordance with the terms of the Plan. The Severance Pay shall be paid in a single lump sum within 30 days following the Employee's Severance Date.

*See* Amendment Number One to 2007 Severance Plan, attached hereto as Ex. 1, Tab J at p. 12-13; *see also* Schedule A to the 2007 Severance Plan, Ex. 1, Tab J at p. 11.[2]

---

[1] Each of the Plaintiffs here held, at the time of their respective terminations, titles placing them into category (ii) of the Severance Plan.

28. On or about May 16, 2011, Unilever held "Town Hall" meetings with the former employees of Alberto-Culver to discuss the merger.

29. Unilever also distributed written materials to all former Alberto-Culver employees in connection with the May 16, 2011 Town Hall meetings ("the Town Hall written materials"), including to Mr. Gorman, Mr. Hennessy, and Mr. Spira. A true and correct copy of the Town Hall written materials is attached hereto as Ex. 1, Tab C.

30. Following those May 16, 2011 Town Hall meetings, Unilever held "break out" meetings to further discuss the salaried and other employees' futures with Unilever. Mr. Gorman, Mr. Hennessy, and Mr. Spira attended those break out meetings. Gary Schmidt of Unilever (a former Alberto-Culver employee) held the break out meeting attended by Mr. Spira. Albert Dechellis, Vice-President of Global Supply Chain for Unilever ("Dechellis"), held the break out meetings attended by Mr. Hennessy; Casey Keller, President of U.S. Business, held the break out meeting attending by Mr. Gorman.

31. Each of the presenters at the break out sessions, including Mr. Schmidt, Mr. Dechellis, and Ms. Keller, were expressly authorized to speak on behalf of Unilever and acted within the scope of their Unilever employment to discuss the topics outlined in the Town Hall written materials, including employment status and benefits going forward.

32. At each of those May 16, 2011 Town Hall meetings (and as reflected in the Town Hall written materials), and at each of the subsequent break out meetings, Unilever's authorized representatives told each of the salaried employees present, including Mr. Gorman, Mr. Hennessy, and Mr. Spira that – within 30 days – they would either be: (a) offered a full-time

[2] *See also* 2007 Severance Plan, Ex. 1, Tab J, and Amendment Number One thereto (*id.* at 12), at pp. 3-4 (defining, *inter alia*, "Employee," "Employer," "Key Employee," "Severance Date," "Severed Employee," and "Successor Company"). Mr. Gorman, Mr. Hennessy, and Mr. Spira are each an "Employee" as defined by the 2007 Severance Plan, and none of them are a "Key Employee" as defined therein.

position with Unilever, or (b) asked to stay for some period of time to support the "integration" of the merger, or (c) "given help" to "transition" from Unilever and thus find a new job outside of Unilever. *See* Town Hall written materials, attached hereto as Ex. 1, Tab C; *see also* Unilever's June 13, 2011 correspondence to Mr. Spira, attached hereto as Ex. 1, Tab D (making the same representations as set forth in (a)-(c) above).

33.     At each of those May 16, 2011 Town Hall meetings, in the Town Hall written materials, and in the break-out sessions, Unilever offered "pro rated" bonuses to the salaried employees, including Mr. Gorman, Mr. Hennessy, and Mr. Spira, as an inducement for them to choose to continue to remain employed by Unilever, and without providing any other conditions precedent to receipt of that "pro rated" bonus, *i.e.* other than agreeing to remain employed with Unilever for any period of time.

34.     At each of those May 16, 2011 Town Hall meetings and in the Town Hall written materials, Unilever represented that, with respect to calendar year 2011, those salaried employees who were already in a bonus plan for 2011 would have their "bonus percentage" doubled – on a *pro rated* basis – as a term and condition of employment for remaining with Unilever after the merger for any period of time. *See* Town Hall written materials, Ex. 1, Tab C; *see also* Unilever correspondence to Mr. Spira, Ex. 1, Tab D.

35.     Subsequent to those meetings, however, Unilever employee Christopher Herrick ("Herrick"), acting as the Unilever Vice President of Human Resources, North America, sent a letter to Plaintiffs that sought to improperly amend the 2007 Severance Plan. *See, e.g.*, Unilever correspondence to Mr. Spira, Ex. 1, Tab D. In that letter, Herrick and Unilever conditioned receipt of any severance and the prorated bonus on the employee staying through the "company

determined exit date" – attempting to effectively remove any consideration of "Good Cause" from the severance determination equation. *Id.*

**MR. SPIRA**

36.     Mr. Spira was employed by Alberto-Culver (and later Unilever) as an in-house attorney, beginning on or about October, 1996, and continuing until August 12, 2011.

37.     Since Mr. Spira's start date at Alberto-Culver and continuing through December 1, 2009, he had received at least one equity grant of Alberto-Culver stock options under the then existing stock option plan in each fiscal year; between 2005 and December 2009,[3] Mr. Spira also received a restricted Alberto-Culver stock grant three times under the then existing restricted stock plan. *See* May 17, 2011 Alberto Culver Equity Grants Distribution Sheet for James M. Spira, a true and correct copy of which is attached hereto as Ex. 1, Tab L (reflecting the fact that Mr. Spira's participation in, and entitlement to benefits from, the Alberto-Culver equity plans immediately prior to the "Change of Control"); *see also* Participant Statement for James Spira, Dated September 17, 2010, a true and correct copy of which is attached hereto as Ex. 1, Tab K.

38.     Indeed, Alberto-Culver had maintained, as part of its employee-compensation plan, a stock option plan at all times since at least 1988, and a restricted stock option plan at all times since at least 1994.

39.     On or about June 13, 2011, Unilever provided Mr. Spira with written notice that stated, *inter alia*:

> Based upon the initial business review, it has been determined that your position is needed to support the integration of the legacy Alberto Culver organization into the go-forward Unilever organization. **Your role will be for a transition period. We anticipate your transition role to end on March 31, 2012.** For all the transition roles scheduled to end in the second quarter of 2012, we will provide further clarity

---

[3] No equity was granted in 2010 due to the prohibition on equity grants included in the Merger Agreement. *See* Alberto-Culver Company Schedule 14-A, dated November 11, 2010, at pp. 49 -50, *available at* http://www.sec.gov/Archives/edgar/data/1368457/000119312510258948/ddefm14a.htm.

on timing in November and we will commit to providing at least 60 days' notice in advance of a separation date.

*See* June 13, 2011 Unilever correspondence to Mr. Spira, Ex. 1, Tab D (emphasis added).

40.     In other words, by way of its June 13, 2011 correspondence, Unilever put Mr. Spira on notice that he was terminated; that he would only be employed by Unilever for some undefined and unguaranteed additional time, but not retained in a permanent capacity; and that his last day of employment would be at the latest, March 31, 2012. *Id.*

41.     Moreover, on or about June, 2011, Mr. Spira was verbally told by Mr. Schmidt of Unilever that he would *not* have continued employment with Unilever because his job as in-house counsel was redundant and no longer needed. At that time, Mr. Spira was also told that, even if another position opened up for an in-house counsel position within Unilever, Mr. Spira would not be allowed to remain in the Chicago area; rather he would have to relocate to New Jersey and work out of Unilever's offices in Englewood Cliffs, New Jersey.

42.     In addition, after May 16, 2011, Unilever unilaterally and materially changed Mr. Spira's duties and responsibilities by taking away virtually all of the types of work that he had formerly performed for Alberto-Culver during the 14 years immediately preceding the merger of Alberto-Culver and Unilever. Indeed, for weeks at a time following the merger, Mr. Spira did not receive any assignments at all and essentially had no duties and responsibilities and no work to perform. At other times, he would receive an occasional assignment, which he readily and capably performed.

43.     As referenced above, under the terms of the 2007 Severance Plan, as amended, "Good Reason," entitling an employee such as Mr. Spira to a receipt of severance pay under its terms, included the following circumstances:

any change by the Company of the Employee's place of employment

> *to a location more than 50 miles from the location of the Employee's*
> *place of employment at the time of the Change of Control.*
>
> \*\*\*
>
> *the failure of the Company to* (i) *continue in effect any employee benefit*
> *plan or compensation plan in which the Employee is participating immediately*
> *prior to such Change in Control*, unless the Employee is permitted to participate
> in other plans providing the Employee *with substantially comparable benefits*
> or *the taking of any action by the Company which would adversely affect the*
> *Employee's participation in or materially reduce the Employee's benefits*
> *under any such plan.*

See 2007 Severance Plan, Ex. 1, Tab J at p. 4, sections 1(j)(2) and (1)(j)(3)(i) (brackets and

emphasis added).

44.     Further, all employees covered by the 2007 Severance Plan, as amended, were

entitled to a receipt of severance pay for another reason, namely when they had been terminated

<u>without</u> cause:

> . . . *termination* of the Employee's employment (1) *by the Company or*
> *Successor Company* [not] *for Cause* . . .[4]

See *Id.*, at p. 5, section 1(m) (brackets and emphasis added).

45.     Accordingly, as of June 13, 2011, Mr. Spira was unequivocally entitled to receipt

of severance pay under the terms of the 2007 Severance Plan because his employment had been

terminated, but it had *not* been terminated for "Cause" as specifically defined by the Plan.[5]

---

[4]     "Cause" for termination is defined as: "(1) a material breach by an Employee of those duties and
responsibilities of the Employee which do not differ in any material respect from the duties and
responsibilities of the Employee during the six-month period immediately prior to a Change in Control
(other than as a result of incapacity due to physical or mental illness) which is demonstrably willful and
deliberate on the Employee's part, which is committed in bad faith or without reasonable belief that such
breach is in the best interest of the Company or (2) the commission by the Employee of a felony
involving moral turpitude." *See* 2007 Severance Plan, Ex. 1, Tab J at p. 1, section 1(b).

[5] The Plan defines "Cause" to mean:

> (1) a material breach by an Employee of those duties and responsibilities of the Employee which
> do not differ in any material respect from the duties and responsibilities of the Employee
> during the six-month period immediately prior to a Change in Control (other than as a result

46.     In fact, Unilever never told, notified, or otherwise indicated to Mr. Spira at any time that he was being terminated for a "material breach" of his "duties and responsibilities," nor did Mr. Spira ever in fact materially breach any of his duties and responsibilities.

47.     Likewise, Unilever never told, notified, or otherwise indicated to Mr. Spira at any time that he was being terminated because of "the commission . . . of a felony involving moral turpitude," nor did Mr. Spira ever commit such an offense.

48.     In addition, as of June 13, 2011, Mr. Spira was entitled to the receipt of severance pay in accordance with the terms of the 2007 Severance Plan, as amended, for a second and wholly separate reason, *i.e.*, based upon the fact that he no longer had continued employment with Unilever *and* that any hypothetical employment with Unilever offered to him in the future would have been some 800 miles away from his place and location of employment immediately prior to the Change of Control (*i.e.*, requiring a transfer from Melrose Park, Illinois to Unilever's offices in Englewood Cliffs, New Jersey).

49.     Mr. Schmidt, acting in his capacity as a Unilever employee and authorized to speak on the Company's behalf, expressly informed Mr. Spira that if any member of the Law Department received any offer of permanent employment with Unilever, that employment would *only* be in New Jersey.  *See* Affidavit of Garret P. Schmidt, Ex. 1, Tab B at ¶ 23.

50.     On or prior to June 13, 2011, Mr. Spira was entitled to receipt of severance pay in accordance with the terms of the 2007 Severance Plan, as amended, for a third and wholly separate reason.  Here, Unilever failed to continue in effect an "employee benefit, plan or

---

of incapacity due to physical or mental illness) which is demonstrably willful and deliberate on the Employee's part, which is committed in bad faith or without reasonable belief that such breach is in the best interests of the Company or (2) the commission by the Employee of a felony involving moral turpitude.

2007 Severance Plan, Ex. 1, Tab J at p.1, section (1)(b).

compensation plan" in which Mr. Spira had participated immediately prior to the Change in Control, *and* Mr. Spira was not allowed to participate in another plan provided by Unilever that had substantially comparable benefits to that which Unilever failed to continue in effect – namely, the Alberto-Culver Stock Option Plan and Restricted Stock Plan.

51.     In addition, on or prior to June 13, 2011, Mr. Spira was entitled to receipt of severance pay in accordance with the terms of the 2007 Severance Plan, as amended, for a fourth and wholly separate reason. Unilever adversely affected Mr. Spira's participation in both the Alberto-Culver Stock Option Plan and Restricted Stock Plan, either of which form an independent basis for recovery.

52.     Furthermore, on or prior to June 13, 2011, Mr. Spira was entitled to receive severance pay in accordance with the terms of the 2007 Severance Plan, as amended, for a fifth and wholly separate reason. Here Unilever materially reduced his benefits under the Alberto-Culver Stock Option Plan and Restricted Stock Plan, either of which forms an independent basis for recovery.

53.     More specifically, immediately prior to the Change of Control on December 17, 2010, Mr. Spira had been a participant in, and entitled to benefits under, two equity plans for Alberto-Culver, namely, the Alberto Culver Company Employee Stock Option Plan and the Restricted Stock Plan. *See* May 17, 2011 Alberto Culver Equity Grants Distribution Sheet for James M. Spira, Ex. 1, Tab L (reflecting the fact that Mr. Spira's participation in, and entitlement to benefits from, the Alberto-Culver equity plans immediately prior to the "Change of Control").

54.     The Alberto Culver Company Employee Stock Option Plan historically formed a very material portion of Mr. Spira's compensation package. From 2005 through 2009,[6] Mr.

---

[6] No equity was granted in 2010 due to the prohibition on equity grants included in the Merger Agreement. *See* Note 3, *supra*.

Spira was granted, as part of his overall compensation, over $525,000 worth of stock options and $232,500 worth of restricted stock (using a share price at the time of the merger).

55.     Over the five year period in which Mr. Spira was granted equity, the value of those options and restricted stock averaged more than 80% of Mr. Spira's average base annual salary.

56.     However, after the date of the merger in May 2011, Mr. Spira was no longer a participant in, or entitled to benefits from, any equity plan whatsoever.  Moreover, Unilever's refusal to continue those plans adversely affected Mr. Spira's participation in the stock equity plans.

57.     Despite Mr. Spira's entitlement to severance pay, on multiple grounds, pursuant to the terms of the 2007 Severance Plan, as amended, Defendants repeatedly denied Mr. Spira's claim for severance pay in contravention of the terms of that Plan.

58.     On or about July 28, 2011, Michael Savage ("Savage"), then employed by Unilever as Senior Director, Total Rewards, told Mr. Spira that Unilever had determined that he was not entitled to severance pay pursuant to the 2007 Severance Plan.

59.     Mr. Spira asked Unilever to "accelerate" (move up) his Company scheduled termination date.

60.     On information and belief, Unilever had selectively accelerated the termination dates of and/or worked to find mutually agreeable dates with several other former Alberto-Culver employees, mostly at the Vice President level in the Severance Plan including, at least, Unilever employees Cynthia Rolfe (a salaried employee in the Severance Plan, then employed in the capacity of Vice-President Global and U.S. Skin Care with Unilever); Derek Bowen, (a salaried employee in the Severance Plan, then employed in the capacity of Vice-President U.S.

Hair Care with Unilever); and Gina Lazaro (a salaried employee in the Severance Plan, then employed in the capacity of Vice President of Marketing Latin America with Unilever) – thus allowing each of them to be paid severance under the terms of the 2007 Severance Plan, as amended, and not having to wait until their actual Company-assigned termination dates to receive their severance pay. In addition, on information and belief, three other Vice Presidents in the Plan were given termination dates on or before August 2011 (thus accommodating six of the approximately ten Vice Presidents who participated in the Plan).

61. Further, on information and belief, at least one member of the former Alberto-Culver Human Resources Department, including Leslie Cray, had her scheduled termination date selectively accelerated and/or was permitted to negotiate with Unilever to find a mutually agreeable date, allowing her to be paid severance under the terms of the 2007 Severance Plan, as amended, and not having to wait until her actual Company-assigned termination dates to receive their severance pay.

62. In July 2011 Schwartz informed Mr. Spira that Unilever had rejected his "acceleration" proposal, and that Unilever had not made and was not making any changes to the exit dates already established.

63. Mr. Spira officially left Unilever on or about August 12, 2011, and accepted employment with another entity.

64. At the time of his departure, Mr. Spira was entitled to receive bonus pay of $21,678, *i.e.*, a 40% prorated bonus (*double* Mr. Spira's normal 20% bonus as agreed to by Defendants in May 2011) for calendar year 2011 through Mr. Spira's last day of employment with the Company.

65.     Defendants did <u>not</u> pay Mr. Spira any of that bonus pay, and have failed and refused to make that bonus payment to him despite his repeated demands for it.

66.     Significantly, based upon the terms of the Plan at the time of his departure, Mr. Spira was also entitled to receive severance pay in the amount of at least $217,788 (as calculated under the 2007 Severance Plan, as amended), based upon Mr. Spira's 14 years and 9.5 months of service, and with a salary of $212,700[7] and a target bonus of 20%.

**<u>Mr. Spira's Appeal of the Denial of his Severance Benefits</u>**

67.     On or about November 4, 2011, Mr. Spira first appealed his denial of severance pay under the terms of the 2007 Severance Plan, as amended, by sending a letter to the Plan Administrator for the Plan.  A true and correct copy of Mr. Spira's November 4, 2011 correspondence is attached hereto as Ex. 1, Tab E.

68.     On December 22, 2011, Unilever employee Chris Herrick ("Herrick"), then employed as Vice President, Human Resources North American, and purporting to be acting as the Plan Administrator for the Plan (although signing the correspondence in both capacities), responded to Mr. Spira's claim – and denied it in all respects.  *See* Herrick December 22, 2011 correspondence, a true and correct copy of which is attached hereto as Ex. 1, Tab F.

69.     In that December 22, 2011 correspondence, Herrick claimed, contrary to the facts, that Unilever did <u>not</u> terminate Mr. Spira's employment and that Mr. Spira had <u>not</u> in fact suffered any reduction in benefits following the merger.

70.     Herrick further reasoned that, despite the fact that any hypothetical employment with Unilever would have been some 800 miles from Mr. Spira's current employment location, Mr. Spira would have had to physically move his place of employment to New Jersey in order to

---

[7]     Mr. Spira's salary at the time of his August 2011 departure from the Company was that same figure.

receive severance pay under the terms of the Plan – an absurd proposition that was contrary to the plain language of the Severance Plan. *See* Herrick December 22, 2011 correspondence, Ex. 1, Tab F at p. 4 (first full paragraph).

71. Notably, in that December 22, 2011 correspondence, Herrick further addressed the question of whether Mr. Spira's benefits had been reduced in any way following the merger. Herrick stated that they had <u>not</u> been reduced at all, claiming that Mr. Spira *would have* received benefits in the future to hypothetically replace those that he had undeniably lost as a result of the merger (*i.e.*, Mr. Spira's participation in the stock option and restricted stock plans). To that issue, Herrick stated as follows:

> In the Claim Letter [Mr. Spira's November 4, 2011 correspondence], you assert that you experienced a reduction in benefits and were not provided with comparable benefits following the Company's acquisition of Alberto-Culver as a result of the Company's failure to provide for your participation in an equity plan, and that you therefore had Good Reason to terminate your employment with the Company. **If you had continued in employment through 2011, you would have received an equity grant under Unilever's long-term equity plan (the Unilever GPSP program) in November 2011, at the same time other similarly situated Unilever employees received equity grants.**

*See* Herrick December 22, 2011 correspondence, Ex. 1, Tab F at p. 4 (second full paragraph) (brackets and emphasis added).

72. During his employment with Alberto-Culver, and subsequently during his employment with Unilever following the merger, no one indicated to Mr. Spira at any time, either verbally or in writing that: (1) there even existed the purported "Unilever GPSP Program," or (2) Mr. Spira was, or might ever be, eligible for any benefits under that or any other equity plan of Unilever. Of course, no such "GPSP Program" or other similar program had even been mentioned by anyone during the May 16, 2011 Town Hall meetings, nor was the "GPSP Program" discussed during any subsequent breakout sessions or conversations with Mr. Schmidt.

73.     On or about June 2011 Mr. Schmidt, who was authorized to speak for Unilever about employment and benefits during the transition period, specifically told Mr. Spira that the only benefits Mr. Spira would receive were contained in the June letter.  *See* June 13, 2011 Unilever correspondence to Mr. Spira, attached hereto as Ex. 1, Tab D; *see also* Affidavit of Garret P. Schmidt, Ex. 1, Tab B at ¶¶ 9, 17 - 18.

74.     Accordingly, the very first time that Mr. Spira ever heard of this alleged Unilever GPSP Program was when he received and reviewed Herrick's December 22, 2011 correspondence.

75.     Indeed, the employee most similarly situated to Mr. Spira, Jake Dickens (sharing Mr. Spira's same title and nearly identical tenure) did not receive any grant through the GPSP or any other program in November or December 2011, despite Mr. Dickens still being employed by Unilever at that time.  *See* Affidavit of John F. Dickens, Ex. 1, Tab A at ¶¶ 13, 16 ("To the best of my knowledge, at no point from the Change in Control Date through my last day of employment on December 31, 2011 did Unilever offer equity or promise to offer equity in the future to me or any other participant in the Severance Plan."; "To the best of my knowledge, at no point from the Change in Control Date through my last day of employment on December 31, 2011 did Unilever offer any other incentive or promise to offer any other incentive to me or any other participant in the Severance Plan who did not receive a permanent offer from Unilever other than the benefits set forth in the June letter (a prorated bonus, severance, subsidized healthcare benefits, and outplacement services.").

76.     In concluding his December 22, 2011 correspondence to Mr. Spira, Herrick further indicated, *inter alia*, that Mr. Spira had 60 days in which to request a review of the 2007 Severance Plan's denial of severance pay and a bonus to him; that Mr. Spira was entitled to

"review any documents pertinent to such claim;" and that Mr. Spira would be provided "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information that is relevant to your appeal;" that the Plan Administrator would "render a written decision, stating specific reasons for the decision, within 60 days of receipt" of Mr. Spira's request for review; and that, if Mr. Spira's claims were denied, he would have the right to pursue his claims in federal court by bringing a civil ERISA action. *See* Ex. 1, Tab F at pp. 5-6.

77.     On January 17, 2012, Mr. Spira timely filed a written request for review/appeal, indicating his intent to appeal the 2007 Severance Plan's December 22, 2011 denial of his claims. *See* Mr. Spira's January 17, 2012 correspondence to the 2007 Severance Plan/Herrick, a true and correct copy of which is attached hereto as Ex. 1, Tab G.

78.     In his January 17, 2012 correspondence, Mr. Spira specifically requested the particular documents and information from the Plan Administrator relevant to his claims and that were required to form the basis for the determination to deny his claims. *Id.* at pp. 1, 2-4 (delineating Mr. Spira's specific, detailed and narrowly tailored requests for information and documents directly relevant to the denial of his claims, totaling approximately 20 documents).

79.     On February 2, 2012, Herrick sent Mr. Spira correspondence purporting to be responsive to Mr. Spira's January 17, 2011 request for information and documents. *See* Herrick's/Plan's February 2, 2012 correspondence, a true and correct copy of which is attached hereto as Ex. 1, Tab H.

80.     However, in his February 2, 2012 letter, Herrick, now apparently recognizing his conflict of interest and signing only as "Plan Administrator," took a wholly different position with respect to the issue of whether Mr. Spira's benefits had been reduced as a result of the merger.

81.     Herrick and the Plan now admitted that no former Alberto-Culver employee/"transition employee" had ever in fact received equity grants under Unilever's GPSP Program – as Herrick and the Plan had previously falsely represented to Mr. Spira.  *Id.* at p. 2.

82.     Instead, Herrick now claimed for – *the first time* – that the Company had allegedly provided "those employees with grants equal to the cash equivalent of the equity grants that otherwise would have been earned under the GPSP Program if the Company met the applicable performance goals."  *Id.* at p. 2.

83.     Herrick further claimed for the first time that Mr. Spira would have also earned such a "cash equivalent of an equity grant," had he continued to be employed by the Defendants. *Id.* at p. 3.

84.     Despite the specific and narrowly tailored requests by Mr. Spira for the information, Herrick did not provide any documents or other information whatsoever  to support the Plan's wholly new position, including *when* Mr. Spira allegedly would have received such a "cash equivalent," or in what amount.  Similarly, Herrick did not identify any employee who had allegedly ever received such a "cash equivalent."  Nor did Herrick attempt to explain how a hypothetical and undefined amount of "cash" could be, under the Plan's approach, by definition comparable or more valuable than the equity of options and restricted stock that Mr. Spira would have received under the Alberto-Culver equity plans (representing, from 2005 through 2009, approximately 80% of Mr. Spira's average base salary).  *See also* Mr. Spira's November 4, 2011 letter, Ex. 1, Tab E at p. 2.  Nor did Herrick attempt to explain how the failure to award Mr. Spira (and other employees covered by the Severance Plan) *any* equity grants could not constitute an action by Unilever which adversely affected Mr. Spira's participation in those plans.

85.     Incredibly, Herrick, on behalf of the Plan, denied each and every request for information and documents that Mr. Spira had made upon Mr. Herrick and the Plan in the context of Mr. Spira's January 17, 2012 correspondence, contending that the requests were not "relevant to [Mr. Spira's] appeal." *See* Herrick's/Plan's February 2, 2012 letter, Ex. 1, Tab H at pp. 1, 3.  That denial was particularly astounding as the only way Herrick could have properly and fairly reviewed Mr. Spira's claim would have been through examining the list of similarly situated employees who received equity grants and/or the alleged GPSP grants, documents specifically requested by Mr. Spira.

86.     The only documents that Herrick and the Plan provided to Mr. Spira along with the February 2, 2012 correspondence were a form grant letter from December 2011 (*id.* at p. 4) (as evidence the grants were made *in November*), and the "GPSP Program" document (*id.* at pp. 5 – 22) – which Herrick simultaneously admitted in his letter *was not even relevant to Mr. Spira's claims*.  *Id.* at p. 3 (stating that, "**Because you would have received the cash equivalent of an equity grant, the Unilever GPSP Program documents are irrelevant to your claim**) (emphasis added).  Indeed, the production of the GPSP Program document was all the more confounding as Herrick admitted, in that same correspondence, that the program did not apply to *any* former Alberto-Culver employees.  *Id.*[8]

87.     In his February 2, 2012 correspondence, Mr. Herrick, on behalf of the Plan, granted Mr. Spira a two-week extension in which to file his request for review/appeal, up to and including March 6, 2012.  *Id.* at p. 3.

---

[8] In his February 2, 2012 correspondence, Herrick, on behalf of the Plan, also took the position for the first time that Mr. Spira's claim for a bonus (*i.e.*, in the amount of at least $24,200) was not a matter that was within the confines of his review, apparently as Plan Administrator, as it did not arise out of the terms of the 2007 Severance Plan.  Less than two months prior, however, Herrick (apparently acting as Plan Administrator <u>and</u> the Vice-President of Human Resources for North America) had somehow found the bonus claim within his purview, determining that Mr. Spira was "not entitled to receive a pro-rated annual bonus."  Herrick's December 22, 2011 correspondence, Ex. 1, Tab F at p. 1.

88.     On February 3, 2012, Mr. Spira sent correspondence to Herrick and the Plan seeking clarification of the procedures with respect to his request for review/appeal.  *See* Mr. Spira's February 3, 2012 correspondence to Herrick/Plan, a true and correct copy of which is attached hereto as Ex. 1, Tab I.

89.     On February 25, 2012, Mr. Spira also sent Herrick and the Plan a lengthy and detailed submission in further support of his request for review/appeal.  Accompanying that appeal and submitted therewith Mr. Spira included a number of relevant documents, including the Affidavits of employees John F. Dickens and Gary P. Schmidt.  *See* Mr. Spira's February 25, 2012 correspondence to Herrick/the Plan, a true and correct copy of which is attached hereto as Ex. 1 at p. 1 (listing twelve exhibits attached in support of Mr. Spira's letter, all of which are included here as Tabs A – L to Ex. 1).

90.     Mr. Schmidt, through that affidavit, attested to a number of important facts, including that:

> Following the town hall meeting on May 16, 2011 ("Town Hall Meeting"), I was instructed by Unilever to talk to all of the employees in the law department (including Mr. Spira) about their roles with Unilever and the benefits that each employee would be entitled to receive, including that as a condition to the payment of severance under the Severance Plan, such participant was required to work through the last day of employment designated by Unilever.
>
> ***
>
> Following the Town Hall Meeting on May 16, 2011, I was unaware of any conditions to the receipt of the pro-rated bonus.
>
> ***
>
> I specifically informed Mr. Spira following the Town Hall Meeting on May 16, 2011 that he was entitled to a pro-rated bonus and did not inform him of any conditions to the receipt of the prorated bonus because at the time I was unaware of any conditions to the receipt of that bonus.
>
> ***

Following the issuance of the June Letter [June 13, 2011], I was instructed by Unilever to talk to the employees in the law department about their roles with Unilever and the benefits that each employee would be entitled to receive.

\*\*\*

I specifically informed Mr. Spira that the only additional benefits he would receive were set forth in the June Letter … and specifically informed him that he would not receive any equity.

\*\*\*

To the best of my knowledge, at no point from the Change in Control Date through my last day of employment on July 15, 2011 did Unilever offer any other incentive or promise to offer any other incentive to any participant in the Severance Plan who did not receive a permanent offer from Unilever, other than the benefits set forth in the June Letter…

\*\*\*

I specifically informed Mr. Spira that if he received a permanent offer of employment with Unilever, such employment would only be in New Jersey.

*See* Affidavit of Garret P. Schmidt, Ex. 1, Tab B at ¶¶ 9, 19-20, 22, 24, 27, 29.

91.     Mr. Dickens, through that affidavit, attested to a number of important facts,

including that:

To the best of my knowledge, Unilever's stated position has always been that the receipt of severance under the Severance Plan was conditioned upon the employee working until the transition end date designated by Unilever.

\*\*\*

Prior to the Closing Date and through my last day of employment on December 31, 2011, it was my understanding that if a member of the law department received a permanent offer of employment with Unilever, such employment would only be in New Jersey.

\*\*\*

Following the Town Hall Meeting on May 16, 2011, I was unaware of any conditions to the receipt of the pro-rated bonus.

26

*See* Affidavit of John F. Dickens, Ex. 1, Tab A at ¶¶ 9, 17, 21.

92.     On April 9, 2012, Herrick, on behalf of the Plan, sent Mr. Spira correspondence in which the Plan again <u>denied outright</u> and in its entirety Mr. Spira's claim for severance pay under the 2007 Severance Plan.  *See* Herrick's April 9, 2012 correspondence to Mr. Spira, a true and correct copy of which is attached hereto as Ex. 2.

93.     However, in his April 9, 2012 correspondence, Herrick, on behalf of the Plan, engaged in yet another about face and contradiction of the Plan's prior position and *admitted* for the first time that Unilever had in fact actually terminated Mr. Spira's employment *on June 13, 2011*.  *Id*. at p. 3, Section II., at Factual Finding "G." ("[T]he June 13, 2011 letter was the first indication that you received from the Company that **your employment would terminate and you would not have a position with the combined companies**") (emphasis added).

94.     In that April 9, 2012 correspondence, Herrick, on behalf of the Plan, further acknowledged that, prior to the merger, Mr. Spira's benefits had in fact included participation in an equity plan as an employee of Alberto-Culver.  *Id*. at p. 3, section II., at Factual Finding "K."

95.     Nonetheless, in denying Mr. Spira's claim in the context of that April 9, 2012 correspondence, Herrick, on behalf of the Plan, continued to take the position that Mr. Spira would have hypothetically received the "cash equivalent of an equity grant under the GPSP program."  *Id.* at pp. 3-4, section II., at Factual Finding "L" through "P."

96.     Herrick did not provide any factual or documentary support whatsoever for that claim, nor did he identify any other employees who were purportedly similarly situated to Mr. Spira and who had also allegedly received such cash equivalents to equity grants.  *Id*.

97.     On information and belief, no participant in the Severance Plan below the level of Vice President had in fact ever received the cash equivalent payout, including Jake Dickens, the

most similarly situated employee to Mr. Spira at Unilever. In effect, Herrick has asked Mr. Spira to "take the Plan's word for it" that such a compensation plan was planned or created.

98. Moreover, Herrick's "calculation" of Mr. Spira's hypothetical "cash equivalent," which Herrick concluded was "more than the $46,000 in equity grants" that Mr. Spira received in prior years, was faulty and misleading. *Id.* at p. 3, section II., at Factual Finding "L".

99. Herrick concluded that Mr. Spira's hypothetical grant would have been $13,314 for 146 days of a three-year period. Herrick then extrapolated that amount to come up with a total value for the assumed grant of $99,858. However, as Herrick admitted, that amount was for a *three year period* (*i.e.* $33,286 per year), far below what Mr. Spira previously received in equity. *Id.*

100. Herrick's conclusion that Mr. Spira would have received more under this hypothetical plan was also based on the erroneous finding that Mr. Spira received only $46,000 per year in equity grants. To reach that finding, Herrick had to ignore the plain words of the very next sentences of Mr. Spira's November 4, 2011 letter to the Plan, which also contained the $46,000 figure Herrick relied upon. Mr. Spira's letter stated that:

> At $37.50 per share, the price Unilever paid to acquire Alberto-Culver, these shares were worth $232,000 on the date of the Merger for an average of approximately $46,000 per year … In addition, I received an option grant every year of my employment (other than 2010 and 2011 for the reasons discussed [in the letter]). These grants have been substantial, totaling more than $525,000 over just the last five years of grants (using $37.50 per share as the sales price).

*See* Mr. Spira's November 4, 2011, Ex. 1, Tab E at p. 2. These grants were plainly far greater than the hypothetical $99,858 Herrick calculated over a three year period.

101. Further, Herrick, on behalf of the Plan, did not provide any explanation at all or offer any criteria for Defendants' termination date acceleration for those other employees.

102.    The Plan's selective accelerations and other accommodations for certain Vice Presidents and at least one members of the Human Resources department allowed those employees to receive severance pay under the 2007 Severance Plan, while *not* accelerating Mr. Spira's termination date prevented him from receiving the severance pay to which he was entitled to receive.

103.    In denying Mr. Spira's claim for severance pay, the Plan again refused to provide Mr. Spira with any additional documents or information that purportedly provided the basis for its determinations.[9]  Ex. 2 at p. 9, n.1.

104.    Due to the inaccuracies in Herrick's April 9, 2012 letter and the failure to provide any relevant documentation reasonably requested by Mr. Spira, on May 26, 2012, Mr. Spira submitted a response to the Plan's determination denying his claim for severance pay.  *See* Mr. Spira's May 26, 2012 correspondence to Mr. Spira, a true and correct copy of which is attached hereto as Ex. 3.  The Plan never responded to Mr. Spira's letter.

105.    Mr. Spira has exhausted all of his remedies as provided for by the 2007 Severance Plan, as amended.

**Mr. Gorman**

106.    Mr. Gorman was employed by Alberto-Culver (and later Unilever) first in its Marketing Department in the capacity of Marketing Manager U.S. Skin Care, and later as its Director of Marketing, US TRESemmé – the position he held at the time of the merger.

---

[9] The Plan did now admit, however, the existence of Unilever's written assumption of the Alberto-Culver Company Salaried Employees Special Severance Plan, though it was not produced to Mr. Spira.  *Id.* at 10. That admission was in direct contrast to Herrick and the Plan's prior initial response to Mr. Spira's document request for the assumption, at which time Herrick responded that no such assumption document existed or was required.  *See* Herrick's February 2, 2012 correspondence, Ex. 1, Tab H at p. 3 ("There was no required assumption of the Severance Plan by the Company.").

107.    On or about December 1, 2006, while then employed by Alberto-Culver, Mr. Gorman was one of "a very small and select group of participants to receive an Alberto-Culver company *restricted* stock grant."   *See* James Marino's (then Alberto-Culver's President and Chief Executive Officer) December 1, 2006 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 4 (emphasis added).  Mr. Gorman received that restricted stock grant pursuant to the terms of the "Alberto-Culver Company 2006 Restricted Stock Plan" ("the 2006 RSP").  *See also* July 20, 2007 Restricted Stock Statement, a true and correct copy of which is attached hereto as Ex. 5.  Mr. Gorman received at least two other grants of Albert-Culver *restricted* stock options.  *See* Marino's October 1, 2008 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 6 (1,500 common shares); *see also* Marino's December 1, 2009 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 7 (700 common shares).

108.    Mr. Gorman also received at least four grants of unrestricted stock options of Albert-Culver stock.  *See* Marino's additional December 1, 2006 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 8 (5,000 common shares); *see also* Alberto-Culver  Company Employee Stock Option Plan of 2006 ("the 2006 ACSOP"), a true and correct copy of which is attached hereto as Ex. 9; Marino's October 1, 2007 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 10 (4,000 common shares); Marino's October 1, 2008 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 11 (4,000 common shares); Marino's December 1, 2009 correspondence to Mr. Gorman, a true and correct copy of which is attached hereto at Ex. 12 (2,600 common shares).

109.    Mr. Gorman, like Mr. Spira, was also a participant and eligible to receive benefits under the 2007 Severance Plan.

110.    On or about June 13, 2011, Unilever provided Mr. Gorman with written notice that stated, *inter alia*:

> Based upon the initial business review, it has been determined that your position is needed to support the integration of the legacy Alberto Culver organization into the go-forward Unilever organization. **Your role will be for a transition period. We anticipate your transition role to end on December 31, 2011.**

*See* June 13, 2011 Unilever correspondence to Mr. Gorman, attached hereto as Ex. 13 (emphasis added).

111.    In other words, by way of its June 13, 2011 correspondence, Unilever put Mr. Gorman on notice that he was terminated; that he would only be employed by Unilever for some undefined and unguaranteed additional time, but not retained in a permanent capacity; and that his last day of employment would be at the latest, December 31, 2011. *Id.*

112.    Shortly thereafter, on or about June 15, 2011, Mr. Gorman met with Brent Shakeshaft ("Shakeshaft"), the Company's Vice President of Global Hair Care.

113.    During that meeting, Shakeshaft confirmed that Mr. Gorman would <u>not</u> be employed with the new Company.

114.    Accordingly, on or about July 5, 2011, Mr. Gorman formally notified his then Manager, Derek Bowen, of his departure date in connection with the termination of his employment with the Company.

115.    Mr. Gorman's last official day of employment with the Company was July 15, 2011, at which time his employment was terminated.

116.    Mr. Gorman was thus unequivocally eligible to receive severance benefits under the 2007 Severance Plan because: (1) his employment was terminated within two years of the

"Change in Control" and without "Cause," and (2) Unilever failed and refused to continue (and adversely affected Mr. Gorman's participation in) the stock option plan (the 2006 ACSOP ), and the restricted stock option plan (the 2006 RSP) that Mr. Gorman had participated in immediately prior to the Change in Control.

117.    Accordingly, at the time of his departure, Mr. Gorman was also entitled to receive severance pay of at least $109,818 *i.e.*, as calculated under the 2007 Severance Plan, as amended, based upon Mr. Gorman's 5 years and 2 months of service, and with an annual salary of $183,030[10] and a target bonus of 20% of that salary.

118.    However, Defendants failed and refused to provide Mr. Gorman with any severance benefits at all under the 2007 Severance Plan.

119.    At the time of his departure, Mr. Gorman was also entitled to receive additional bonus pay of at least $13,038, *i.e.*, a 40% prorated bonus (*double* Mr. Gorman's normal 20% bonus as agreed to by Defendants in May 2011) for calendar year 2011 through Mr. Gorman's last day of employment with the Company.

120.    Defendants did *not* pay Mr. Gorman any of that bonus pay, and have failed and refused to make that bonus payment to him despite his repeated demands for it.

121.    Indeed, on or about May 11, 2012, Mr. Gorman wrote to Herrick/the Plan and requested that Defendants pay to him his severance benefits under the 2007 Plan, his bonus then due, and/or "appealing" the Defendants' apparent denial of his claim for those benefits.  *See* Mr. Gorman's May 11, 2012 correspondence, a true and correct copy of which is attached hereto as Ex. 14 at p. 2.[11]

---

[10]     Mr. Gorman's salary at the time of his July 2011 departure from the Company was that same figure.

[11] Mr. Gorman "appealed" the denial of his benefits because he had initially made a claim for severance on July 14, 2011, by writing to Unilever's Michael Savage, Kent Madlinger, Gary Schmidt, and David

122.     In his May 11, 2011, request Mr. Gorman also demanded that Defendants provide him with specific documents and information regarding the Plan's denial of his claim for severance benefits.  In closing, Mr. Gorman further stated, "I understand I will receive written notification as to the disposition of my appeal within 60 days.  Please contact me if you require any additional information."  *Id.*

123.     Herrick and the Plan failed and refused to timely respond in any way to Mr. Gorman, or to provide him with any of the documents that he requested – all of which were directly relevant to Defendants' denial of his claim for severance benefits.

124.     Consequently, on or about January 25, 2013, Mr. Gorman, through counsel, sent a demand to Herrick/the Plan, once again demanding the payment to him of the severance benefits to which he was entitled to receive under the 2007 Severance Plan.  *See* January 25, 2013 letter from attorney Laurie Holmes to Herrick/the Plan, a true and correct copy of which is attached hereto as Ex. 15.

125.     On March 1, 2013, nearly 300 days after Mr. Gorman's demand for an "appeal," and 596 days after his initial demand, Herrick/the Plan sent correspondence to Mr. Gorman's counsel denying in its entirety Mr. Gorman's request for his bonus and benefits under the 2007 Severance Plan.  *See* Herrick/the Plan's March 1, 2013 correspondence, a true and correct copy of which is attached hereto as Ex. 17.[12]

---

Schwartz.  *See* July 14, 2011 email from Robert Gorman, a true and correct copy of which is attached hereto as Ex. 16.  Herrick/the Plan took 596 days to respond to the initial request, acknowledging receipt at some unknown date, but disclaiming any responsibility because Mr. Gorman did not send the email to the Plan Administrator – a person/role he did not even know existed.  *See* Herrick/the Plan's March 1, 2013 correspondence, a true and correct copy of which is attached hereto as Ex. 17.

[12] In that denial, Herrick, acting as "Plan Administrator," denied Mr. Gorman's demand for his bonus, despite having already admitted in separate correspondence nearly one year earlier, that bonus claims were not a matter that was within the confines of his review.  *See* Herrick/Plan's February 2, 2012 correspondence, Ex. 1, Tab H at p. 1.

126.     Pursuant to the terms of the 2007 Severance Plan, Herrick's/the Plan's March 1, 2013 response and denial letter was clearly untimely in light of the fact that the Plan was required to respond to Mr. Gorman within 60 days.  *See* 2007 Severance Plan, Ex. 1, Tab J at Section 3(d).

127.     Therefore, Herrick's/the Plan's March 1, 2013 correspondence and denial letter was a nullity, and the Plan was barred and estopped from denying Mr. Gorman benefits and from relying (then or now) upon any alleged bases for the denial of benefits to Mr. Gorman.  *Id.*

128.     In that March 1, 2013 letter, Herrick, on behalf of the Plan, denied that the Company's elimination of the equity grant plan, formerly provided as compensation to Mr. Gorman, constituted a "failure of the Company to (i) continue in effect any employee … compensation plan."  Ex. 17 at p. 8.

129.     Instead, Herrick, on behalf of the Plan, argued that Mr. Gorman *would have* been eligible for a hypothetical (but undefined) "cash equivalent" if he had remained with the Company until December 2011.  *Id.*  Herrick contended that "a cash equivalent grant would have been more valuable than an equity grant because [Mr. Gorman] would have been able to realize the immediate value." Herrick claimed that the cash equivalent could have been "used or invested … as [Mr. Gorman] pleased," purportedly making it more valuable than the eliminated equity grants.

130.     Herrick and the Plan did not recognize that hypothetical "cash in hand" would *not* be more valuable than equity because Mr. Gorman could not purchase Unilever equity at the same price that the "cash equivalent" was calculated against.  The value decreases further once the transaction costs of any equity purchase and/or other investment are considered.

131. On March 15, 2013, Herrick/the Plan sent additional correspondence to Mr. Gorman's counsel affirming the denial of Mr. Gorman's request for benefits under the 2007 Severance Plan, and referencing his March 1, 2013 correspondence. *See* Herrick's/the Plan's March 15, 2013 correspondence to Ms. Holmes, a true and correct copy of which is attached hereto at Ex. 18.

132. Mr. Gorman has exhausted all of his remedies as provided for by the 2007 Severance Plan, as amended.

**Mr. Hennessy**

133. Mr. Hennessy was employed by Alberto-Culver (and later Unilever) in the position of Senior Director of Global Engineering in the Global Operations Administration Department – the position he held at the time of Change in Control and at the time of the consummation of the merger.

134. At the time of the Change in Control, Mr. Hennessy had been employed with Alberto-Culver for more than twenty (20) year, *i.e.*, 20.05 years.

135. On or about October 18, 2010, Alberto-Culver provided Mr. Hennessy with a document indicating that he would be eligible for severance pay under the terms of the 2007 Severance Plan of at least fifty-two (52) weeks, as of that date. *See* October 18, 2010 "Alberto-Culver US Salaried Employee Information Sheet," prepared for and provided to Mr. Hennessy by the Company on or about that same date, attached hereto as Ex. 19.

136. Prior to the Change in Control, Mr. Hennessy (like Plaintiffs Mr. Spira and Mr. Gorman) had been a participant in the 2006 ACSOP as well as the 2006 RSP.

137. Accordingly, in calendar years 2006, 2007, 2008, and 2009 Mr. Hennessy received stock grants under the terms of the 2006 ACSOP in the amounts of, respectively, 8,300;

6,000; 5,900; and 5,000 shares of Alberto-Culver common stock. *See* November 9, 2010 Alberto Culver Equity Grants Information Sheet for Timothy Hennessy, a true and correct copy of which is attached hereto at Ex. 20.

138.    In addition, in calendar year 2008, Mr. Hennessy received a restricted grant of 1,000 shares of Albert-Culver common stock under the terms of the 2006 RSP. *Id.*

139.    On or about June 13, 2011, Unilever provided Mr. Hennessy with written notice that stated, *inter alia*:

> Based upon the initial business review, it has been determined that your position is needed to support the integration of the legacy Alberto Culver organization into the go-forward Unilever organization. **Your role will be for a transition period. We anticipate your transition role to end in the second quarter 2012.** For all the transition roles scheduled to end in the second quarter of 2012, we will provide further clarity on timing in November and we will commit to providing at least 60 days' notice in advance of a separation date . . .

*See* June 13, 2011 Unilever correspondence to Mr. Hennessy, attached hereto as Ex. 21 (emphasis added).

140.    In other words, by way of its July 13, 2011 correspondence, Unilever put Mr. Hennessy on notice that he was terminated; that he would only be employed by Unilever for some undefined and unguaranteed additional time, but not kept on in a permanent capacity; and that his last day of employment would likely be in the second quarter of 2012 – but that the Company would let him know of his official exit date. *Id.*

141.    Moreover, on August 4, 2011, Mr. Hennessy was told verbally by Ms. Vera Bakker of Unilever that, because he was a Director level employee, any potential continued employment with Unilever would require him to relocate and thereafter to relocate in the future on an on-going basis – instead of working out of his office in Melrose Park, Illinois where he had worked for more than the past twenty years. As Ms. Bakker explained, Unilever expected

36

Director level employees to be willing to relocate at any time, and if Mr. Hennessy was not interested in frequent relocation, he would not be able to continue as a Director level employee. At that time, Ms. Bakker was employed by Unilever in the position of Director, and Mr. Hennessy reported to Ms. Bakker.

142.    Mr. Hennessy was entitled to the receipt of severance pay under the terms of the 2007 Severance Plan because his employment had been terminated, but it had *not* been terminated for "Cause" as specifically defined by the Plan.

143.    In fact, Unilever never told, notified, or otherwise indicated to Mr. Hennessy at any time that he was being terminated for a "material breach" of his "duties and responsibilities," nor did Mr. Hennessy ever in fact materially breach any of his duties and responsibilities.

144.    Likewise, Unilever never told, notified, or otherwise indicated to Mr. Hennessy at any time that he was being terminated because of "the commission . . . of a felony involving moral turpitude," nor did Mr. Hennessy ever in fact commit such an offense.

145.    Mr. Hennessy was entitled to the receipt of severance pay in accordance with the terms of the 2007 Severance, as amended, for a second and wholly separate reason, *i.e.*, based upon the fact that he no longer had continued employment with Unilever *and* that any hypothetical future employment with Unilever that might be offered to him would have been some *800 miles* away from his place and location of employment immediately prior to the Change in Control (*i.e.*, requiring a transfer from Melrose Park, Illinois to Unilever's offices in Englewood Cliffs, New Jersey).

146.    Furthermore, Mr. Hennessy was entitled to the receipt of severance pay in accordance with the terms of the 2007 Severance, as amended, for a third and wholly separate reason.  Here, Unilever failed to continue in effect an "employee benefit, plan or compensation

plan" in which Mr. Hennessy had participated in immediately prior to the Change in Control, *and* Mr. Hennessy was not allowed to participate in another plan provided by Unilever that had substantially comparable benefits to that which Unilever failed to continue in effect.

147.     In addition, Mr. Hennessy was entitled to receipt of severance pay in accordance with the terms of the 2007 Severance Plan, as amended, for a fourth and wholly separate reason. Unilever adversely affected Mr. Hennessy's participation in both the Alberto-Culver stock option and restricted stock option plan, either of which form an independent basis for recovery.

148.     More specifically, as noted above, immediately prior to the Change in Control, Mr. Hennessy was a participant in, and entitled to benefits under, both the 2006 ACSOP and the 2006 RSP.

149.     Furthermore, as noted above, Unilever accelerated the termination dates of several Unilever employees who were similarly situated to Mr. Hennessy, and thus paid each of them severance pay under the terms of the 2007 Severance Plan, as amended.

150.     Accordingly, Mr. Hennessy also requested that his termination date/exit date be likewise accelerated.

151.     Mr. Hennessy made that request upon Al Dechellis ("Dechellis"), then employed by Unilever as Vice President of Global Supply Chain, on or about August 26, 2011.

152.     On or about September 1, 2011, Unilever denied Mr. Hennessy's request.  On that date, Dechellis told Mr. Hennessy that his request was denied and that he had first spoken to Mike Savage ("Savage") of Unilever, then employed by Unilever as Senior Director of Total Rewards, and that Savage had stated, "No way" in response to Mr. Hennessy's request.

153.     Moreover, throughout 2011 and prior to September 30, 2011, Unilever took away all of Mr. Hennessy's material job duties, and also put many of his job responsibilities "on hold."

154. Furthermore, in or about December 1, 2011, Unilever announced that it would be closing the Melrose Park facility where Mr. Hennessy had worked for the past twenty years. Even before that "official" announcement, and since at least June, 2011, Mr. Hennessy and other high level employees had been working on the closing of the Melrose Park facility.

155. On September 30, 2011, Mr. Hennessy's employment with Unilever officially ended.

156. At the time of his departure, Mr. Hennessy was entitled to receive severance pay of at least $265,278 *i.e.*, as calculated under the 2007 Severance Plan, as amended, based upon Mr. Hennessy's over 20 years of service, and with an annual salary of $221,065[13] and a target bonus of 20% that salary.

157. However, Defendants failed and refused to provide Mr. Hennessy with any severance benefits at all under the 2007 Severance Plan.

158. At the time of his departure, Mr. Hennessy was also entitled to receive additional bonus pay of at least $34,401, *i.e.*, a 40% prorated bonus (*double* Mr. Hennessy's normal 20% bonus as agreed to by Defendants in May 2011) for calendar year 2011 through Mr. Hennessy's last day of employment with the Company.

159. Defendants did *not* pay Mr. Hennessy any of that bonus pay, and have failed and refused to make that bonus payment to him despite his repeated demands for it.

160. More specifically, on October 26, 2011, Mr. Hennessy wrote to the Plan/Plan Administrator of the 2007 Severance Plan requesting that he be paid severance pay (*i.e.* his base salary and annual bonus) under the terms of the 2007 Severance Plan. *See* Mr. Hennessy's

---

[13] Mr. Hennessy's salary at the time of his September 2011 departure from the Company was that same figure.

October 26, 2011 cover letter (e-mail) and accompanying correspondence, attached hereto as Ex. 22, in which he made demand upon the Plan for payment of his severance benefits.

161.    In that October 26, 2011 correspondence, Mr. Hennessy also made a request and demand upon Defendants for payment of his "double bonus," on a pro rated basis.  *Id.*

162.    On or about December 28, 2011, Herrick, on behalf of Unilever and the 2007 Severance Plan, responded in an untimely manner to Mr. Hennessy's October 26, 2011 correspondence.  *See* Herrick's/the Plan's December 28, 2011 correspondence to Mr. Hennessy, a true and correct copy of which is attached hereto as Ex. 23.

163.    In that December 28, 2011 correspondence, Herrick/the Plan denied in its entirety Mr. Hennessy's request for benefits under the 2007 Severance Plan, as well as Mr. Hennessy's request for the payment of his bonus.  *Id.*

164.    In so doing, Herrick/the Plan claimed, *inter alia*, that Unilever had <u>not</u> terminated Mr. Hennessy's employment; that Mr. Hennessy did <u>not</u> himself have "Good Reason" under the terms of the 2007 Severance Plan to terminate his own employment with the Company; and that Mr. Hennessy *would have* received benefits equal to his pre-Change in Control benefits if only he had remained employed by Unilever.  *Id.* at p. 3.

165.    With respect to the "Good Reason" issue, Herrick/the Plan contended that Mr. Hennessy had not actually physically moved his employment from Melrose Park to New Jersey, and that he was actually required to first physically move in order to receive severance pay under the terms of the 2007 Severance Plan – an absurd proposition that was directly contrary to the plain language of the 2007 Severance Plan.

166.    With respect to the question of whether, after the Change in Control, Mr. Hennessy did *not* receive a benefit he had previously received as an employee of Alberto-Culver

prior to that Change, Herrick/the Plan claimed that, had Mr. Hennessy remained employed by Unilever until November 2011, he would have received "an incentive grant in November 2011, at the same time as other similarly situated Unilever employees received long-term incentive grants." *Id.* at p. 3, last full paragraph.

167.     Finally, with respect to Mr. Hennessy's request for his double bonus, Herrick/the Plan <u>admitted</u> that the bonus claimed by Mr. Hennessy had in fact been announced by Defendants at the above-referenced May 2011 Town Hall meetings, and thus that such a bonus plan had been in place. *Id.*  However, Herrick/the Plan simultaneously contended that Mr. Hennessy was nonetheless <u>not</u> entitled to the receipt of his bonus under that plan because he had not been employed with Unilever on December 31, 2011. *Id.* at p. 4, second full paragraph.

168.     In denying all benefits to Mr. Hennessy, Herrick/the Plan further instructed Mr. Hennessy that he had sixty (60) days in which to appeal the above-referenced decisions. *Id.* at p. 4, at section IV.

169.     Pursuant to the terms of the 2007 Severance Plan, Herrick's/the Plan's December 28, 2011 response and denial letter was clearly untimely in light of the fact that the Plan was required to respond to Mr. Hennessy within 60 days. *See* 2007 Severance Plan, Ex. 1, Tab J at Section 3(d).

170.     Therefore, Herrick's/the Plan's December 28, 2011 correspondence and denial letter was a nullity, and the Plan was barred and estopped from denying Mr. Hennessy benefits and from relying (then or now) upon any alleged bases for the denial of benefits to Mr. Hennessy. *Id.*

171.     Thereafter, on both January 20, 2012 and February 7, 2012, Mr. Hennessy wrote to Herrick/the Plan to advise them of his intent to appeal the December 28, 2011 denial of

benefits to him and specifically requesting particular documents and information from the Plan Administrator relevant to his claims and which formed the basis for the determination to deny his claims. *See* Mr. Hennessy's January 20, 2012 and February 7, 2012 correspondence to Herrick/the Plan, true and correct copies of which are attached hereto as Ex. 24 (delineating Mr. Hennessy's specific, detailed, and narrowly tailored requests for information and documents directly relevant to the denial of his claims).

172.    On February 8, 2012, Herrick/the Plan sent Mr. Hennessy correspondence purporting to be responsive to Mr. Hennessy's January 20 and February 7, 2012 requests for information and documents. *See* Herrick's/the Plan's February 8, 2012 correspondence, a true and correct copies of which are attached hereto as Ex. 25.

173.    In that February 8, 2012 correspondence, Herrick/the Plan refused to produce any documents requested by Mr. Hennessy in his January 20 and February 7, 2012 correspondence, *except for* one document that Herrick admitted in that same correspondence was entirely irrelevant to Mr. Hennessy's request for severance benefits. *Id.* at p. 2, third full paragraph.

174.    Likewise, Herrick/the Plan refused to provide Mr. Hennessy with the information that he had requested, which was also directly relevant to his claim for severance pay under the 2007 Severance Plan. *Id.*

175.    Moreover, in that February 8, 2012 correspondence, Herrick/the Plan changed its story and did yet another about face regarding the Plan's position (previously communicated to Mr. Hennessy in the December 28, 2011 denial letter – *see* Ex. 23, *supra*) regarding whether Mr. Hennessy had been denied benefits by Unilever that he had previously received while employed by Alberto-Culver and prior to the Change in Control.

176. Thus, Herrick and the Plan admitted for the first time that no former Alberto-Culver employee/"transition employee" had in fact ever received equity grants under Unilever's GPSP Program – as Herrick and the Plan had previously represented to Mr. Hennessy. Ex. 25 at p. 2, second full paragraph.

177. Instead, Herrick now claimed for the first time that the Company provided "those employees with incentive grants equal to the cash equivalent of the equity grants that otherwise would have been earned under the GPSP Program if the Company met the applicable performance goals." *Id.*

178. Herrick did not, however, identify any employee who had allegedly received such an "incentive grant," nor did he provide any documentation to support the fact that any employee actually received such a grant. *Id.*

179. Based upon Mr. Hennessy's own specific internal investigation and inquiries to Unilever – including to his local direct Supervisor, Al Dechellis, then Vice-President of Global Supply Chain for Unilever – no employee ever actually received such an incentive grant.

180. Moreover, Unilever admitted to Mr. Hennessy in June 2011, through Mr. Hennessy's then direct Supervisor, Pedro Silveria, that Mr. Hennessy was not eligible for, and would <u>not</u> receive, any other benefits or incentives of any kind, except for severance pay under the 2007 Severance Plan. Indeed, at that time, Mr. Silveria told Mr. Hennessy that Hennessy already had "the big package."

181. In concluding his February 8, 2012 letter to Mr. Hennessy, Herrick/the Plan specifically granted Mr. Hennessy an extension of time, up to and including March 12 2012, in which to submit an appeal to him/the Plan an opposition to the denial of Mr. Hennessy's claim for severance pay under the 2007 Severance Plan. *Id.* at p. 3.

182.    On March 3, 2012, Mr. Hennessy timely appealed the Plan's denial of severance benefits.  *See* Mr. Hennessy's March 3, 2012 appeal letter, a true and correct copy of which is attached hereto as Ex. 26.

183.    On May 2, 2012, Herrick/the Plan denied entirely Mr. Hennessy's claim for severance benefits under the 2007 Severance Plan.  *See* Herrick's May 2, 2012 correspondence denying Mr. Hennessy's appeal in its entirety, a true and correct copy of which is attached hereto as Ex. 27.

184.    Herrick, on behalf of the Plan, denied that the Company's elimination of the equity grant plan, formerly provided as compensation to Mr. Gorman, constituted a "failure of the Company to (i) continue in effect any employee … compensation plan." *Id.* at 12.

185.    Instead, Herrick, on behalf of the Plan, argued that Mr. Hennessy *would have* been eligible for a hypothetical (but undefined) "cash equivalent" if he had remained with the Company until December 2011.  *Id.* at 13.  Herrick contended that "a cash equivalent grant would have been more than substantially comparable to the benefits that [Mr. Hennessy] received immediately prior to a Change In Control."  *Id.*  Herrick argued that the cash equivalent could have been "used or invested … as [Mr. Hennessy] pleased," apparently making it more valuable than the eliminated equity grants.

186.    Again, Herrick and the Plan did not recognize that hypothetical "cash in hand" would *not* be more valuable than equity because Mr. Hennessy could not purchase Unilever equity at the same price that the "cash equivalent" was calculated against.  The value decreases further once the transaction costs of any equity purchase and/or other investment are considered.

187.    Defendants have never paid Mr. Hennessy any severance benefits under the 2007 Severance Plan or otherwise, nor have they paid him his double, prorated bonus for his work

throughout 2011 for Unilever and for his agreement to remain employed by Unilever following the Change in Control.

188.    Mr. Hennessy has exhausted all of his remedies as provided for by the 2007 Severance Plan, as amended.

## CLAIMS

### COUNT I
### (By Mr. Spira For
### Violations of ERISA)

189.    Plaintiff, Mr. Spira, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 188 above as Paragraph 189 of Count I of this Complaint.

190.    This cause of action arises under ERISA, 29 U.S.C. §§ 1001-1461, and is brought by Mr. Spira against Defendants to enforce the terms of the Plan, as amended.

191.    As set forth above, Mr. Spira was entitled to severance pay in the amount of at least $217,800 under the terms of the 2007 Severance Plan because: (1) Unilever terminated his employment on June 13, 2011 without "Cause" as specifically defined by that Plan; (2) whether or not Unilever terminated Mr. Spira's employment without "Cause," the only location available for former members of the law department to work would have required him re-locate to New Jersey; (3) Unilever failed and refused to allow Mr. Spira to participate in another plan that had substantially comparable benefits to which he had regularly received prior to the Alberto-Culver/Unilever merger, including options and restricted stock, either of which forms an independent basis for recovery; (4) Unilever adversely affected Mr. Spira's participation in the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (5) Unilever materially reduced Mr. Spira's benefits under the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (6) Unilever

and Herrick amended the Plan in a manner adverse to participants, prohibited by the Plan, by adding a condition that Plan participants had to work until an arbitrary date, selected by Unilever, in other to receive severance; and (7) alternatively, the "termination" date set for Mr. Spira should have been "accelerated" such that he would have been immediately "eligible" for severance pay under the 2007 Severance Plan, in light of the fact that other, participants in the Severance Plan, including Vice Presidents and at least one member of the Human Resources department had their termination dates so accelerated.

192.    Defendants acted arbitrarily and capriciously in denying Mr. Spira his severance and intentionally, maliciously, and deliberately failed and refused to provide that severance pay to Mr. Spira.

193.    As a direct and proximate cause of the 2007 Severance Plan's failure and refusal to provide Mr. Spira with severance pay under the terms of that Plan, Mr. Spira has suffered monetary damages, in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan (*i.e.*, at least $217,788).

**WHEREFORE**, Plaintiff, James Spira, by and through his undersigned counsel, respectfully requests the entry of an Order on Count I, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT II
### (By Mr. Spira For Breach
### of Fiduciary Duties)

194.    Plaintiff, Mr. Spira, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 193 above as Paragraph 194 of Count II of this Complaint.

195.    This cause of action arises under ERISA, 29 U.S.C. § 1132(a)(3), and is brought by Mr. Spira against Defendants Herrick and Unilever based upon their breaches of fiduciary duty in carrying out the terms of the 2007 Severance Plan, as amended.

196.    Defendants Herrick and Unilever are and were Plan "fiduciaries" within the meaning of ERISA, 29 U.S.C. § 1132(a)(3), and with respect to the 2007 Severance Plan, as amended, as they exercised authority or discretion over the administration of that Plan.

197.    Alternatively, even if Unilever was not a fiduciary with respect to the 2007 Severance Plan, as amended, Unilever is vicariously liable for Herrick's breaches of his fiduciary duties because it chose, employed, and paid Herrick to act in the capacity of Plan Administrator.

198.    At all relevant times, Herrick served in a dual role: that of Vice President Human Resources for Unilever as well as purporting to serve as the Plan Administrator for the 2007 Severance Plan, as amended.

199.    At all relevant times, Unilever employed and paid its own employee and agent, Herrick, to serve in the dual role as its Vice President Human Resources, and also as the Plan Administrator to carry out the 2007 Severance Plan, as amended.

200.    Defendants Herrick and Unilever breached the fiduciary duties in one or more of the following ways: (1) by failing and refusing to provide Mr. Spira with the documents and information that he specifically requested and to which he was entitled, and which were directly relevant to his claim under the 2007 Severance Plan, as amended – including the information and

documents specifically requested by Mr. Spira in his January 17, 2012 correspondence to the 2007 Severance Plan/Herrick, as referenced above; (2) by acting arbitrarily, capriciously, and maliciously in failing and refusing to pay and/or authorize the payment to Mr. Spira of the severance pay to which he was entitled to receive under the terms of the 2007 Severance Plan, as amended; (3) fraudulently representing to Mr. Spira that he did not suffer a loss of benefits following the Change in Control on December 17, 2010 by knowingly, falsely claiming that he would have received "equity grants" where no such equity grants were intended for Mr. Spira and where Defendants knew that no such equity grants were intended for Mr. Spira; (4) fraudulently representing to Mr. Spira that he did not suffer a loss of benefits following the Change in Control on December 17, 2010 by knowingly and falsely claiming that Mr. Spira would have received the cash equivalent of an equity grant under the GSPS Program in November 2011, where no such grants were intended for Mr. Spira and where Defendants knew no such equity grants were intended for Mr. Spira; (5) refusing to "accelerate" the termination date set for Mr. Spira, where they accelerated the termination dates or otherwise made accommodations primarily for Vice Presidents and members of the Human Resources department – and therefore made those employees "eligible" for severance pay under the 2007 Severance Plan – by applying and imposing a wholly subjective test that had no criteria whatsoever but instead was based upon personal whims and relationships and discriminating in favor of Vice Presidents to the detriment of Mr. Spira; (6) implementing Unilever's elimination of Good Reason as Vice President, Human Resources and deciding claims for Good Reason purportedly as Plan Administrator with no intention or ability to grant claims for Good Reason; (7) Herrick fraudulently holding himself out as Plan Administrator prior to his appointment in April 2012; (8) acting in a capacity of both the "accelerator" or "non-accelerator" of termination

dates from a human resources standpoint on behalf of Unilever while simultaneously acting as the decision-maker as fiduciaries under the Plan; and (9) by wrongfully amending the Severance Plan to the detriment of Plan participants, in violation of the Plan, by eliminating "Good Reason" from the Plan.

201.    As a direct and proximate cause of Defendants' breaches of their fiduciary duties, Mr. Spira has suffered monetary damages, including the sums that he lost/was not paid, and to which he was entitled pursuant to the terms of the 2007 Severance Plan, as amended.

**WHEREFORE**, Plaintiff, James Spira, by and through his undersigned counsel, respectfully requests the entry of an Order on Count II, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT III
### (For Violations of ERISA)

202.    Plaintiff, Mr. Spira, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 201 above as Paragraph 202 of Count III of this Complaint.

203.    This cause of action arises under ERISA, 29 U.S.C. § 1132(c)(1), and is brought by Mr. Spira against Defendants based upon their intentional and willful refusal to provide Mr. Spira with the documents and materials that he requested from them that formed the basis for the determination to deny his claim for severance pay.

204.    Defendants are liable under these provisions of ERISA for penalties in an amount equal to the sum of $110 per day per violation for each day that they failed and refused to

provide Mr. Spira with the approximately 20 documents that he reasonably requested and to which he was entitled.

**WHEREFORE**, Plaintiff, James Spira, by and through his undersigned counsel, respectfully requests the entry of an Order on Count III, granting judgment in his favor and against Defendants for penalties in the amount of $110 per day per violation, beginning on November 4, 2011 and continuing through the date of judgment in this action; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT IV
### (By Mr. Spira for Violations of the
### Illinois Wage Payment And Collection Act)

205.    Plaintiff, Mr. Spira, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 204 above as Paragraph 205 of Count IV of this Complaint.

206.    This Court has jurisdiction over this claim pursuant to its supplement jurisdiction over Plaintiffs' related State law claims.

207.    This cause of action arises under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et. seq.* ("the Act"), and is brought by Mr. Spira against Defendants Unilever and Herrick based upon their refusal to pay him his 2011 pro rated bonus as described above in the amount of at least $21,678.

208.    Pursuant to the terms of the Act, at all relevant times, Unilever is and was an "employer" as defined by the Act.  *See* 820 ILCS 115/1.

209.    Pursuant to the terms of the Act, at all relevant times, Herrick also is and was an "employer" as defined by the Act because he knowingly and intentionally permitted and caused Unilever to violate the provisions of the Act.  *See* 820 ILCS 115/13.

210. Pursuant to the terms of the Act, at all relevant times, Mr. Spira was an "employee" as defined by the Act. *Id.*

211. Pursuant to the terms of the Act, the bonus owed by Unilever to Mr. Spira constitutes "final compensation" within the meaning of the Act. *See* 820 ILCS 115/2.

212. Pursuant to the terms of the Act, Defendants were required to pay the bonus they owed to Mr. Spira at the time of his separation from the Company (*i.e.*, August 12, 2011), and in "no case later than the next regularly scheduled payday" for Mr. Spira.

213. Despite Mr. Spira's repeated demands upon Defendants for his bonus, Defendants intentionally and knowingly failed and refused to make that payment to Mr. Spira.

214. As a direct and proximate cause of Defendants' violations of the Act, Mr. Spira has suffered monetary damages.

215. Pursuant to the terms of the Act, Defendants are liable to Mr. Spira, in addition to the amount of the bonus that they failed to pay to him, for "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." *See* 820 ILCS 115/14.

216. Pursuant to the terms of the Act, Defendants are also liable to Mr. Spira for his costs and all of his reasonable attorneys' fees. *Id.*

**WHEREFORE**, Plaintiff, James Spira, by and through his undersigned counsel, respectfully requests the entry of an Order on Count IV, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled to receive as his 2011 pro rated bonus, plus interest, for all monetary relief and penalties to which he is entitled to recover under the Act, for his reasonable attorneys' fees and costs, and for all such other and further relief as is appropriate under the circumstances.

## COUNT V
### (By Mr. Spira for
### Breach of Verbal Contract)

217.    Plaintiff, Mr. Spira, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 216 above as Paragraph 217 of Count V of this Complaint.

218.    This Court has jurisdiction over this claim pursuant to its supplemental jurisdiction over Plaintiffs' related State law claims.

219.    This cause of action arises under Illinois common law, and is brought by Mr. Spira against Defendant Unilever based upon its breach of the verbal contract with Mr. Spira to pay him a 2011 pro rated, double bonus as described above in the amount of at least $21,678.

220.    The parties' agreement constituted a valid and enforceable verbal contract, pursuant to which Mr. Spira agreed to continue his employment with Unilever in exchange for the payment by Unilever to a bonus as described above.

221.    Mr. Spira carried out the terms of the parties' contract and performed all conditions precedent to receiving the contractually agreed upon bonus.

222.    Nonetheless, Unilever breached the parties' contract by failing and refusing to pay Mr. Spira the bonus to which he was entitled.

223.    As a direct and proximate cause of Defendant's breach of the parties' contract, Mr. Spira has suffered monetary damages.

**WHEREFORE**, Plaintiff, James Spira, by and through his undersigned counsel, respectfully requests the entry of an Order on Count V, granting judgment in his favor and against Defendant Unilever in an amount representing the monies to which he was entitled to receive as his 2011 pro rated bonus as a result of the parties' verbal contract, plus interest, and for all such other and further relief as is appropriate under the circumstances.

## COUNTV VI
## (By Mr. Gorman For
## Violations of ERISA)

224.     Plaintiff, Mr. Gorman, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 223 above as Paragraph 224 of Count VI of this Complaint.

225.     This cause of action arises under ERISA, 29 U.S.C. §§ 1001-1461, and is brought by Mr. Gorman against Defendants to enforce the terms of the Plan, as amended.

226.     As set forth above, Mr. Gorman was entitled to severance pay in the amount of $109,818 under the terms of the 2007 Severance Plan because: (1) Unilever terminated his employment on June 15, 2011 without "Cause" as specifically defined by that Plan; (2) Unilever failed and refused to allow Mr. Gorman to participate in another plan that had substantially comparable benefits to which he had regularly received prior to the Alberto-Culver/Unilever merger, including options and restricted stock, either of which forms an independent basis for recovery; (3) Unilever adversely affected Mr. Gorman's participation in the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (4) Unilever materially reduced Mr. Gorman's benefits under the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (5) Unilever and Herrick amended the plan in a manner adverse to participants, prohibited by the Plan, by addition a condition that Plan participants had to work until an arbitrary date, selected by Unilever, in other to receive severance; and (6) alternatively, the "termination" date set for Mr. Gorman should have been "accelerated" such that he would have been immediately "eligible" for severance pay under the 2007 Severance Plan, in light of the fact that other, participants in the Severance Plan, including Vice Presidents and at least one member of the Human Resources department had their termination dates so accelerated.

227.    Defendants acted arbitrarily and capriciously in denying Mr. Gorman his severance and intentionally, maliciously, and deliberately failed and refused to provide that severance pay to Mr. Gorman.

228.    As a direct and proximate cause of the 2007 Severance Plan's failure and refusal to provide Mr. Gorman with severance pay under the terms of that Plan, Mr. Gorman has suffered monetary damages, in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan.

**WHEREFORE**, Plaintiff, Robert Gorman, by and through his undersigned counsel, respectfully requests the entry of an Order on Count VI, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT VII
### (By Mr. Gorman For
### Breach of Fiduciary Duties)

229.    Plaintiff, Mr. Gorman, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 228 above as Paragraph 229 of Count VII of this Complaint.

230.    This cause of action arises under ERISA, 29 U.S.C. § 1132(a)(3), and is brought by Mr. Gorman against Defendants Herrick and Unilever based upon their breaches of fiduciary duty in carrying out the terms of the 2007 Severance Plan, as amended.

231.    Defendants Herrick and Unilever are and were Plan "fiduciaries" within the meaning of ERISA, 29 U.S.C. § 1132(a)(3), and with respect to the 2007 Severance Plan, as amended, as they exercised authority or discretion over the administration of that Plan

232.    Alternatively, even if Unilever is or was not a fiduciary with respect to the 2007 Severance Plan, as amended, Unilever is vicariously liable for Herrick's breaches of his fiduciary duties because it chose, employed, and paid Herrick to act in the capacity of Plan Administrator.

233.    At all relevant times, Herrick served in a dual role: that of Human Resources Manager for Unilever as well as purporting to serve as the Plan Administrator for the 2007 Severance Plan, as amended.

234.    At all relevant times, Unilever employed and paid its own employee and agent, Herrick, to serve in the dual role as its Human Resources Manager, and also as the Plan Administrator to carry out the 2007 Severance Plan, as amended.

235.    Defendants Herrick and Unilever breached the fiduciary duties in one or more of the following ways: (1) by failing and refusing to provide Mr. Gorman with the documents and information that he specifically requested and to which he was entitled, and which were directly relevant to his claim under the 2007 Severance Plan, as amended – including the information and documents specifically requested by Mr. Gorman in his May 11, 2012 correspondence to the 2007 Severance Plan/Herrick, as referenced above; (2) by acting arbitrarily, capriciously, and maliciously in failing and refusing to pay and/or authorize the payment to Mr. Gorman of the severance pay to which he was entitled to receive under the terms of the 2007 Severance Plan, as amended; (3) fraudulently representing to Mr. Gorman that he did not suffer a loss of benefits following the merger by knowingly and falsely claiming that he would have received "equity grants" where no such equity grants were intended for Mr. Gorman and where Defendants knew that no such equity grants were intended for Mr. Gorman; (4) failing to respond in a timely manner by waiting nearly 600 days to respond to Mr. Gorman's initial demand for his severance pay; (5) refusing to "accelerate" the termination date set for Mr. Gorman, where they accelerated

the termination dates or otherwise made accommodations primarily for Vice Presidents and members of the Human Resources department – and therefore made those employees "eligible" for severance pay under the 2007 Severance Plan – by applying and imposing a wholly subjective test that had no criteria whatsoever but instead was based upon personal whims and relationships and discriminating in favor of Vice Presidents to the detriment of Mr. Gorman; (6) implementing Unilever's elimination of Good Reason as Vice President, Human Resources, while purportedly acting as Plan Administrator; (7) fraudulently holding Herrick out as Plan Administrator prior to his appointment in April 2012; (8) Herrick acting in a capacity of both the "accelerator" or "non-accelerator" of termination dates from a human resources standpoint on behalf of Unilever while simultaneously acting as the decision-maker as fiduciaries under the Plan; and (9) by wrongfully amending the Severance Plan to the detriment of Plan participants, in violation of the Plan, by eliminating "Good Reason" from the Plan.

236. As a direct and proximate cause of Defendants' breaches of their fiduciary duties, Mr. Gorman has suffered monetary damages, including the sums that he lost/was not paid, and to which he was entitled pursuant to the terms of the 2007 Severance Plan, as amended.

**WHEREFORE**, Plaintiff, Robert Gorman, by and through his undersigned counsel, respectfully requests the entry of an Order on Count VII, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT VIII
### (By Mr. Gorman
### For Violations of ERISA)

237.     Plaintiff, Mr. Gorman, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 236 above as Paragraph 237 of Count VIII of this Complaint.

238.     This cause of action arises under ERISA, 29 U.S.C. § 1132(c)(1), and is brought by Mr. Gorman against Defendants based upon their intentional and willful refusal to provide Mr. Gorman with the documents and materials that he requested from them that related to the determination to deny his claim for severance pay.

239.     Defendants are liable under these provisions of ERISA for penalties in an amount equal to the sum of $110 per day per violation for each day that they failed and refused to provide Mr. Gorman with the documents that he requested.

**WHEREFORE**, Plaintiff, Robert Gorman, by and through his undersigned counsel, respectfully requests the entry of an Order on Count VIII, granting judgment in his favor and against Defendants for penalties in the amount of $110 per day per violation, beginning on May 11, 2011 and continuing through the date of judgment in this action; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

## COUNT IX
### (By Mr. Gorman for Violations of the
### Illinois Wage Payment And Collection
### Act)

240.     Plaintiff, Mr. Gorman, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 239 above as Paragraph 240 of Count IX of this Complaint.

241.     This Court has jurisdiction over this claim pursuant to its supplement jurisdiction over Plaintiffs' related State law claims.

242. This cause of action arises under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et. seq.* ("the Act"), and is brought by Mr. Gorman against Defendants Unilever and Herrick based upon their refusal to pay him his 2011 pro rated bonus as described above in the amount of at least $13,038.

243. Pursuant to the terms of the Act, at all relevant times, Unilever is and was an "employer" as defined by the Act. *See* 820 ILCS 115/1.

244. Pursuant to the terms of the Act, at all relevant times, Herrick also is and was an "employer" as defined by the Act because he knowingly permitted Unilever to violate the provisions of the Act. *See* 820 ILCS 115/13.

245. Pursuant to the terms of the Act, at all relevant times, Mr. Gorman was an "employee" as defined by the Act. *Id.*

246. Pursuant to the terms of the Act, the bonus owed by Unilever to Mr. Gorman constitutes "final compensation" within the meaning of the Act. *See* 820 ILCS 115/2.

247. Pursuant to the terms of the Act, Defendants were required to pay the bonus it owed to Mr. Gorman at the time of his separation from the Company (*i.e.* July 15, 2011), and in "no case later than the next regularly scheduled payday" for Mr. Gorman.

248. Despite Mr. Gorman's repeated demands upon Defendants for his bonus, Defendants deliberately, intentionally, and knowingly failed and refused to make that payment to Mr. Gorman.

249. As a direct and proximate cause of Defendants' violations of the Act, Mr. Gorman has suffered monetary damages.

250. Pursuant to the terms of the Act, Defendants are liable to Mr. Gorman, in addition to the amount of the bonus that they failed to pay to him, for "damages of 2% of the amount of

any such underpayments for each month following the date of payment during which such underpayments remain unpaid." *See* 820 ILCS 115/14.

251.    Pursuant to the terms of the Act, Defendants are also liable to Mr. Gorman for his costs and all of his reasonable attorneys' fees. *Id.*

**WHEREFORE**, Plaintiff, Robert Gorman, by and through his undersigned counsel, respectfully requests the entry of an Order on Count IX, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled to receive as his 2011 pro rated bonus, plus interest, for all monetary relief and penalties to which he is entitled to recover under the Act, for his reasonable attorneys' fees and costs, and for all such other and further relief as is appropriate under the circumstances.

**COUNT X**
**(By Mr. Gorman for**
**Breach of Verbal Contract)**

252.    Plaintiff, Mr. Gorman, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 251 above as Paragraph 252 of Count X of this Complaint.

253.    This Court has jurisdiction over this claim pursuant to its supplemental jurisdiction over Plaintiffs' related State law claims.

254.    This cause of action arises under Illinois common law, and is brought by Mr. Gorman against Defendant Unilever based upon its breach of the verbal contract with Mr. Gorman to pay him a 2011 pro rated, double bonus as described above in the amount of at least $13,038.

255.    The parties' agreement constituted a valid and enforceable verbal contract, pursuant to which Mr. Gorman agreed to continue his employment with Unilever in exchange for the payment by Unilever to a bonus as described above.

256.     Mr. Gorman carried out the terms of the parties' contract and performed all conditions precedent to receiving the contractually agreed upon bonus.

257.     Nonetheless, Unilever breached the parties' contract by failing and refusing to pay Mr. Gorman the bonus to which he was entitled.

258.     As a direct and proximate cause of Defendant's breach of the parties' contract, Mr. Gorman has suffered monetary damages.

**WHEREFORE**, Plaintiff, Robert Gorman, by and through his undersigned counsel, respectfully requests the entry of an Order on Count X, granting judgment in his favor and against Defendant Unilever in an amount representing the monies to which he was entitled to receive as his 2011 pro rated bonus as a result of the parties' verbal contract, plus interest, and for all such other and further relief as is appropriate under the circumstances.

## COUNT XI
### (By Mr. Hennessy For
### Violations of ERISA)

259.     Plaintiff, Mr. Hennessy, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 258 above as Paragraph 259 of Count XI of this Complaint.

260.     This cause of action arises under ERISA, 29 U.S.C. §§ 1001-1461, and is brought by Mr. Hennessy against Defendants to enforce the terms of the Plan, as amended.

261.     As set forth above, Mr. Hennessy was entitled to severance pay in the amount of at least $265,278 under the terms of the 2007 Severance Plan because: (1) Unilever terminated his employment on June 13, 2011 without "Cause" as specifically defined by that Plan; (2) whether or not Unilever terminated Mr. Hennessy's employment without "Cause," the only location available for him to work would have required him re-locate to New Jersey; (3)

Unilever failed and refused to allow Hennessy to participate in another plan that had substantially comparable benefits to which he had regularly received prior to the Alberto-Culver/Unilever merger, including options and restricted stock, either of which forms an independent basis for recovery; (4) Unilever adversely affected Mr. Hennessy's participation in the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (5) Unilever materially reduced Mr. Hennessy's benefits under the stock option plan and the restricted stock plan, either of which forms an independent basis for recovery; (6) Unilever and Herrick amended the plan in a manner adverse to participants, prohibited by the Plan, by addition a condition that Plan participants had to work until an arbitrary date, selected by Unilever, in other to receive severance; and (7) alternatively, the "termination" date set for Mr. Hennessy should have been "accelerated" such that he would have been immediately "eligible" for severance pay under the 2007 Severance Plan, in light of the fact that other, participants in the Severance Plan, including Vice Presidents and at least one member of the Human Resources department had their termination dates so accelerated.

262.    Defendants acted arbitrarily and capriciously in denying Mr. Hennessy his severance and intentionally, maliciously, and deliberately failed and refused to provide that severance pay to Mr. Hennessy.

263.    As a direct and proximate cause of the 2007 Severance Plan's failure and refusal to provide Mr. Hennessy with severance pay under the terms of that Plan, Mr. Hennessy has suffered monetary damages, in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan.

**WHEREFORE**, Plaintiff, Timothy Hennessy, by and through his undersigned counsel,

respectfully requests the entry of an Order on Count XI, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

**COUNT XII**
**(By Mr. Hennessy For**
**Breach of Fiduciary Duties)**

264. Plaintiff, Mr. Hennessy, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 263 above as Paragraph 264 of Count XII of this Complaint.

265. This cause of action arises under ERISA, 29 U.S.C. § 1132(a)(3), and is brought by Mr. Hennessy against Defendants Herrick and Unilever based upon their breaches of fiduciary duty in carrying out the terms of the 2007 Severance Plan, as amended.

266. Defendants Herrick and Unilever are and were Plan "fiduciaries" within the meaning of ERISA, 29 U.S.C. § 1132(a)(3), and with respect to the 2007 Severance Plan, as amended, as they exercised authority or discretion over the administration of that Plan.

267. Alternatively, even if Unilever was not a fiduciary with respect to the 2007 Severance Plan, as amended, Unilever is vicariously liable for Herrick's breaches of his fiduciary duties because it chose, employed, and paid Herrick to act in the capacity of Plan Administrator.

268. At all relevant times, Herrick served in a dual role: that of Human Resources Manager for Unilever as well as the Plan Administrator for the 2007 Severance Plan, as amended.

269.     At all relevant times, Unilever employed and paid its own employee and agent, Herrick, to serve in the dual role as its Human Resources Manager, and also as the Plan Administrator to carry out the 2007 Severance Plan, as amended.

270.     Defendants Herrick and Unilever breached the fiduciary duties in one or more of the following ways: (1) by failing and refusing to provide Mr. Hennessy with the documents and information that he specifically requested and to which he was entitled, and which were directly relevant to his claim under the 2007 Severance Plan, as amended – including the information and documents specifically requested by Mr. Hennessy in his January 20, 2012 and February 7, 2012 correspondence to the 2007 Severance Plan/Herrick, as referenced above; (2) by acting arbitrarily, capriciously, and maliciously in failing and refusing to pay and/or authorize the payment to Mr. Hennessy of the severance pay to which he was entitled to receive under the terms of the 2007 Severance Plan, as amended; (3) fraudulently representing to Mr. Hennessy that he did not suffer a loss of benefits following the merger by knowingly, falsely claiming that he would have received "equity grants" where no such equity grants were intended for Mr. Hennessy and where Defendants knew that no such equity grants were intended for Mr. Hennessy; (4) refusing to "accelerate" the termination date set for Mr. Hennessy, where they accelerated the termination dates assigned to other similarly situated salaried employees – and therefore made those employees "eligible" for severance pay under the 2007 Severance Plan – by applying and imposing a wholly subjective test that had no criteria whatsoever but instead was based upon personal whims and relationships; (5) Herrick implementing Unilever's elimination of Good Reason as Vice President, Human Resources, while purportedly acting as Plan Administrator; (6) Herrick fraudulently holding himself out as Plan Administrator prior to his appointment in April 2012; (7) Herrick acting in a capacity of both the "accelerator" or "non-

accelerator" of termination dates from a human resources standpoint on behalf of Unilever while simultaneously acting as the decision-maker as fiduciaries under the Plan; and (8) by wrongfully amending the Severance Plan to the detriment of Plan participants, in violation of the Plan, by eliminating "Good Reason" from the Plan.

271.    As a direct and proximate cause of Defendants' breaches of their fiduciary duties, Mr. Hennessy has suffered monetary damages, including the sums that he lost/was not paid, and to which he was entitled pursuant to the terms of the 2007 Severance Plan, as amended.

**WHEREFORE**, Plaintiff, Timothy Hennessy, by and through his undersigned counsel, respectfully requests the entry of an Order on Count XII, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was entitled but did not receive as severance pay under the 2007 Severance Plan, and interest; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

### COUNT XIII
**(By Mr. Hennessy For
Violations of ERISA)**

272.    Plaintiff, Mr. Hennessy, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 271 above as Paragraph 272 of Count XIII of this Complaint.

273.    This cause of action arises under ERISA, 29 U.S.C. § 1132(c)(1), and is brought by Mr. Hennessy against Defendants based upon their intentional and willful refusal to provide Mr. Hennessy with the documents and materials that he requested from them that related to  the determination to deny his claim for severance pay.

274.     Defendants are liable under these provisions of ERISA for penalties in an amount equal to the sum of $110 per day per violation for each day that they failed and refused to provide Mr. Hennessy with the documents that he requested.

**WHEREFORE**, Plaintiff, Timothy Hennessy, by and through his undersigned counsel, respectfully requests the entry of an Order on Count XIII, granting judgment in his favor and against Defendants for penalties in the amount of $110 per day per violation, continuing through the date of judgment in this action; for his attorneys' fees and costs; and for such other and further relief as is appropriate under the circumstances.

### COUNT XIV
### (By Mr. Hennessy for Violations of the
### Illinois Wage Payment And Collection Act)

275.     Plaintiff, Mr. Hennessy, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 274 above as Paragraph 275 of Count XIV of this Complaint.

276.     This Court has jurisdiction over this claim pursuant to its supplement jurisdiction over Plaintiffs' related State law claims.

277.     This cause of action arises under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et. seq.* ("the Act"), and is brought by Mr. Hennessy against Defendants Unilever  and Herrick based upon their refusal to pay him his 2011 pro rated bonus as described above in the amount of at least $34,401.

278.     Pursuant to the terms of the Act, at all relevant times, Unilever is and was an "employer" as defined by the Act.  *See* 820 ILCS 115/1.

279.    Pursuant to the terms of the Act, at all relevant times, Herrick also is and was an "employer" as defined by the Act because he knowingly permitted Unilever to violate the provisions of the Act.  *See* 820 ILCS 115/13.

280.    Pursuant to the terms of the Act, at all relevant times, Mr. Hennessy was an "employee" as defined by the Act.  *Id.*

281.    Pursuant to the terms of the Act, the bonus owed by Unilever to Mr. Hennessy constitutes "final compensation" within the meaning of the Act.  *See* 820 ILCS 115/2.

282.    Pursuant to the terms of the Act, Defendants were required to pay the bonus it owed to Mr. Hennessy at the time of his separation from the Company (i.e., September 30, 2011), and in "no case later than the next regularly scheduled payday" for Mr. Hennessy.

283.    Despite Mr. Hennessy's repeated demands upon Defendants for his bonus, Defendants intentionally and knowingly failed and refused to make that payment to him.

284.    As a direct and proximate cause of Defendants' violations of the Act, Mr. Hennessy has suffered monetary damages.

285.    Pursuant to the terms of the Act, Defendants are liable to Mr. Hennessy, in addition to the amount of the bonus that they failed to pay to him, for "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid."  *See* 820 ILCS 115/14.

286.    Pursuant to the terms of the Act, Defendants are also liable to Mr. Hennessy for his costs and all of his reasonable attorneys' fees.  *Id.*

**WHEREFORE**, Plaintiff, Timothy Hennessy, by and through his undersigned counsel, respectfully requests the entry of an Order on Count XIV, granting judgment in his favor and against Defendants Herrick and Unilever in an amount representing the monies to which he was

entitled to receive as his 2011 pro rated bonus, plus interest, for all monetary relief and penalties to which he is entitled to recover under the Act, for his reasonable attorneys' fees and costs, and for all such other and further relief as is appropriate under the circumstances.

**COUNT XV**
**(By Mr. Hennessy for**
**Breach of Verbal Contract)**

287.     Plaintiff, Mr. Hennessy, incorporates by reference and re-alleges as though fully set forth herein, Paragraphs 1 through 286 above as Paragraph 287 of Count XV of this Complaint.

288.     This Court has jurisdiction over this claim pursuant to its supplement jurisdiction over Plaintiffs' related State law claims.

289.     This cause of action arises under Illinois common law, and is brought by Mr. Hennessy against Defendant Unilever based upon its breach of the verbal contract with Mr. Hennessy to pay him a 2011 pro rated, double bonus as described above in the amount of at least $34,401.

290.     The parties' agreement constituted a valid and enforceable verbal contract, pursuant to which Mr. Hennessy agreed to continue his employment with Unilever in exchange for the payment by Unilever to a bonus as described above.

291.     Mr. Hennessy carried out the terms of the parties' contract and performed all conditions precedent to receiving the contractually agreed upon bonus.

292.     Nonetheless, Unilever breached the parties' contract by failing and refusing to pay Mr. Hennessy the bonus to which he was entitled.

293.     As a direct and proximate cause of Defendant's breach of the parties' contract, Mr. Hennessy has suffered monetary damages.

**WHEREFORE**, Plaintiff, Timothy Hennessy, by and through his undersigned counsel, respectfully requests the entry of an Order on Count XV, granting judgment in his favor and against Defendant Unilever in an amount representing the monies to which he was entitled to receive as his 2011 pro rated bonus as a result of the parties' verbal contract, plus interest, and for all such other and further relief as is appropriate under the circumstances.

Dated: November 25, 2013                    RESPECTFULLY SUBMITTED,


                                            By:     /s/ Michael I. Leonard
                                                    Attorneys for Plaintiffs

**LEONARD LAW OFFICES**
Michael I. Leonard, Esq.
Ethan E. White, Esq.
203 N. LaSalle Street
Suite 1620
Chicago, IL  60601
(312)380-6559 (direct)
(312)264-0671 (fax)
mleonard@leonardlawoffices.com
ewhite@leonardlawoffices.com